MARITIME FISH PRODUCTS, INC., Appellant, v WORLD-WIDE FISH PRODUCTS, INC., Respondent. (Action No. 1.)

MARITIME FISH PRODUCTS, INC., Appellant, v ROY CHRISTENSEN et al., Respondents. (Action No. 2.)

First Department, March 15, 1984

APPEARANCES OF COUNSEL

*Robert Markewich* of counsel (*Joseph Aronauer* and *Arthur Markewich* with him on the brief; *Markewich, Friedman & Markewich, P. C.,* attorneys), for appellant in Actions Nos. 1 and 2.

*Harold I. Kaplan* of counsel (*Michael I. Wolfson* with him on the brief; *Blum, Kaplan, Friedman, Silberman & Beran,* attorneys), for respondents in Actions Nos. 1 and 2.

## OPINION OF THE COURT

SULLIVAN, J. P.

Maritime Fish Products, Inc., appeals from two judgments which, after a joint trial, nonjury, dismissed its actions for employee disloyalty and trade dress infringement.

Maritime sells dried fish purchased from Canadian packers to wholesale distributors and retail chains throughout the United States and the Caribbean. It is managed by its president, Roald Hertzwig, who, in 1970, hired Roy Christensen, his cousin, as a salesman for the New York metropolitan area on a straight salary basis.

Christensen soon established himself as a trusted and valued employee, becoming, without dollar limitation, a sole signatory of Maritime's checking account. On July 7, 1976 he was named a vice-president. His total compensation that year exceeded $48,000. Seven months later, however, on February 11, 1977, Christensen resigned from Maritime and began to work for World-Wide Fish Products, Inc., which he had secretly incorporated 14 months earlier, installing his wife as secretary-treasurer and his father-in-law as vice-president. World-Wide proceeded and continues to compete directly with Maritime. At no time during his service with Maritime was Christensen bound by a restrictive covenant.

The events giving rise to this litigation had their inception in 1974, when, following a lead from a Maritime customer, Christensen found a buyer in the Dominican Republic, Exportadora De Frutos. Christensen concedes that he never advised Maritime of this opportunity; instead, he decided to take it for himself. With the acquisition of Frutos as his first customer, Christensen contacted

Graham Garrison, Maritime's resident buyer of dried fish in Canada.

Through Garrison, Christensen located a source of supply, North Star Fisheries, an unregistered packer and apparently a corporate shell created to enable Christensen and Garrison to avoid detection. Its vice-president and secretary was Garrison. No one ever dealt with it other than Christensen, who made no further purchases from it after resigning from Maritime.

World-Wide's first sale to Frutos was made in January, 1976, within weeks of World-Wide's incorporation. By June, 1976 World-Wide had completed four other transactions with Frutos, of which neither Maritime nor Hertzwig had any notice. In each instance World-Wide was prepaid, even in advance of its purchase from its supplier, North Star.

Christensen did not appear at the trial of the employee disloyalty action, despite service upon him of a subpoena. At his pretrial deposition, although given proper notice, Christensen, stating he was unable to locate such documents, failed to produce World-Wide's general ledger, and its accounts receivable and payable ledgers for the period 1975-1977. Christensen also could not recall whether World-Wide had filed a tax return for 1976. Its former accountant testified, however, not only that he prepared a 1976 tax return, but also that he reviewed the cash receipts, cash disbursements and general ledger for that year, all of which he had returned to Christensen. Christensen also testified that he could not find any of World-Wide's sales invoices for transactions prior to his resignation from Maritime.

After the close of all the evidence in the employee disloyalty case, Christensen did appear to testify in the unfair competition case with the explanation that, notwithstanding the subpoena served on him, he "did not know he was going to be called as a witness for [Maritime]." Thus, the documents which Maritime had sought at his deposition were never produced at trial. Nevertheless, on the basis of the available evidence it was established that World-Wide received $121,678.34 on the five Frutos transactions, realizing a profit of $38,395.14.

Whether Christensen or World-Wide was involved during this period in more than these five transactions, either with Frutos or other purchasers, presently unknown, cannot be determined on this record, but there are indications of Christensen's continued extracurricular activities right up to the time of his resignation. Chemical Bank made cable transfers aggregating $47,510 from World-Wide to the Royal Bank of Canada payable to various Canadian dried fish packers during the months of January and February, 1977, the last being just 10 days before his resignation. In his deposition Christensen admitted that these cable transfers were for the purpose of purchasing fish.

Furthermore, when confronted at his deposition with documented evidence of secret trips to Nova Scotia while still in Maritime's employ, Christensen testified that he had no recollection of those trips. The dates of his hotel and auto rental charges, however, corresponded approximately to the dates of the cable transfers to the Canadian fish packers. Finally, World-Wide's bank statement for the month of February, 1977 showed a deposit of $20,204.36, which Christensen could not explain. Thus, as a result of Christensen's inability to produce sales invoices at his deposition and his absence from the trial, the identity of the purchasers to whom World-Wide sold this fish, and any profit made thereon, were never established. From the timing of the purchases, however, it is apparent that such sales were consummated just before or after Christensen's resignation, by which time World-Wide had acquired a warehouse and established a delivery system.

In his deposition testimony, Christensen attempted to justify his private dealings with Frutos with the explanation that Hertzwig refused to sell in the Dominican Republic because he had once incurred a "bad debt" there, and "was not about to be stung a second time." Christensen, however, was unable to describe any of the circumstances of the supposed bad debt, and his explanation was undermined by his own witness, a former employee of Maritime, who ascribed Hertzwig's reluctance to do business in the Dominican Republic to refrigeration problems. Significantly, Christensen's attorney never cross-examined

Hertzwig on the subject. In any event, Christensen admitted in his deposition that he never informed Hertzwig that Frutos was willing to prepay. It is also undisputed that Maritime does indeed sell in the Dominican Republic.

In the unfair competition case Maritime established that it is the industry leader in the distribution of Canadian dried fish, having grossed almost $6,000,000 in 1976. Its products are distributed mainly to retailers serving the Hispanic community. The biggest selling items are boneless and bone-in dried codfish.

In the late 1960's, Maritime switched from selling dried fish, whole, to selling it in individual portions. At the same time, it designed a new and distinctive trade dress for the individual portions, which are packaged in polyethylene bags. These designs had been in use between 7 and 10 years when World-Wide began to use a strikingly similar design. For example, Maritime employs a basic red-and-blue color scheme on its cartons and polyethylene packages — red dominating blue for bone-in cod, with blue dominating red for boneless cod. World-Wide uses the same red-and-blue combinations, with the same color reversals. Maritime, however, markets its products under the name Fox River, while World-Wide utilizes its own name.

While the brand names differ, the points of similarity in the polyethylene bag are manifold. The width and length of the bag is the same. The lower border of the design on each has the same number of waves, of similar height, breaking in the same direction. The information on each package, i.e., brand name, directions, weight, and type of fish, appears in identical places. The type is the same size and face. The text of the directions is the same. The circle in each design is almost the same diameter. The word "brand" in each circle curves upward while the brand name itself curves downward. Each brand name breaks its respective circle in two opposite places.

Trial Term dismissed both complaints. In the trade dress infringement action, it found that there was no "likelihood of confusion" since wholesalers are sophisticated purchasers who would perceive the acknowledged difference in brand name between the competing packages. In the employee disloyalty action, it concluded that Mari-

time failed to sustain its burden of proof since "[t]he record is devoid of any evidence to support any claim that Roy Christensen did anything other than take preparatory steps to set up his business of World Wide prior to leaving Maritime's employment." While, in our view, the dismissal of the trade dress infringement action was proper, the finding in the employee disloyalty action completely distorts the record, and that dismissal cannot stand.

While arguing that the likelihood of confusion should be presumed since the design of its trade dress was intentionally copied, Maritime concedes that none of its arguments can substitute for this court's own examination of the competing packages themselves. As we noted in *Gotham Silk Hosiery Co. v Reingold* (223 App Div 260, 265), "the * * * boxes in question are before us for examination and they present what seems to us the best possible evidence as to likelihood of confusion."

◼ Having examined the design of the competing packages we find that the two most prominent features, i.e., the brand name and especially the logo, are so significantly dissimilar as to differentiate the products. Whether the packages are examined from the perspective of a sophisticated wholesaler, as was the standard Trial Term adopted, or an unsophisticated consumer, as Maritime urges, the result is the same — the likelihood of confusion is nonexistent. Prominently displayed in large letters on Maritime's package is the label "Fox River Brand" with the logo of a fox. World-Wide's package contains the label "World-Wide Brand" set within a circle design with crossed grid lines, symbolizing latitude and longitude, and depicting a globe.

Recognizing such a blatant difference in trade dress, Maritime concedes, as it must, that "side by side" comparison would enable a consumer to distinguish the two products. It argues, however, that competing products are never sold side by side. Yet, despite the distribution of approximately 2,500,000 World-Wide polyethylene bags with the challenged trade dress as of the time of trial, Maritime failed to offer evidence of a single instance of consumer confusion or of any marketing survey indicating the likelihood of same. Instead, it offered the testimony of a marketing and advertising consultant experienced in the

promotion of Hispanic-oriented foods. Although unable to communicate with the customers because of a lack of conversance with Spanish, this witness, who had visited a number of bodegas, expressed the opinion that Hispanic retail customers tend to be more "brand loyal" than others, and that the designs of the competing products were "very similar" and likely to confuse. World-Wide presented witnesses active in the trade who testified as to the lack of actual confusion. It also established that a third competitor used a package with the same similarities to Maritime's design as World-Wide's, but like World-Wide, it had a clearly indicated different brand name, and that Maritime had never objected to its design.

In any event, the presumption of a likelihood of confusion from the various similarities of the two designs, or on the basis of a conscious imitation of Maritime's trade dress (see *Harold F. Ritchie, Inc. v Chesebrough-Pond's, Inc.*, 281 F2d 755, 758-759), is clearly rebuttable. (*RJR Foods v White Rock Corp.*, 603 F2d 1058.) Since, from our examination of the designs on the competing packages we are satisfied that any such presumption has been rebutted, Maritime is not entitled to an accounting of World-Wide's sales and profits.

■ The employee disloyalty action, in which Maritime seeks damages sustained as a result of Christensen's activity for his own account while in its employ, stands, however, on a different footing. Maritime established, at the very least, without contradiction, that during a five-month period while so employed Christensen engaged in five secret transactions involving the sale of dried fish, the product it sold.

Although section 717 of the Business Corporation Law,[*] which imposed a statutory obligation of good faith and diligence on a corporate officer, does not apply to these transactions since they occurred just prior to Christensen's promotion to the vice-presidency of Maritime, his conduct, even by common-law standards, still failed to measure up to the level of good faith and loyalty required of an em-

---

[*] At the time section 717 of the Business Corporation Law regulated the conduct of corporate officers and directors. As a result of 1977 amendments, section 715 now sets the standard for officers while section 717 applies only to directors.

ployee. It is a firmly established principle in the law of this State that, "[An employee] is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties. Not only must the employee or agent account to his principal for secret profits but he also forfeits his right to compensation for services rendered by him if he proves disloyal." (*Lamdin v Broadway Surface Adv. Corp.*, 272 NY 133, 138; see, also, *Western Elec. Co. v Brenner*, 41 NY2d 291, 295; *Murray v Beard*, 102 NY 505.)

When, as here, the employee engages in a business which, by its nature, competes with the employer's a double breach of duty occurs. "Not only is the principal deprived of the services for which he has contracted, but he finds these services turned against himself." (*Reis & Co. v Volck*, 151 App Div 613, 615.)

On this record it is apparent that Christensen abandoned all pretense to the loyalty expected of a trusted employee. He surreptitiously organized a competing corporation, corrupted a fellow employee, and secretly pursued and profited from one or more opportunities properly belonging to his employer. Trial Term's interpretation notwithstanding, Christensen's covert, faithless conduct in the Frutos transactions from, at the very least, January to June, 1976, during which period he accepted compensation in excess of $20,000, cannot be justified as honorable preparatory activity. Clearly, an agent may secretly incorporate a competitive business prior to his departure as long as he does not use his principal's time, facilities or proprietary secrets to build the competing business. (See, e.g., *Feiger v Iral Jewelry*, 85 Misc 2d 994, affd 52 AD2d 524, affd 41 NY2d 928; also *Apollo Stationery Co. v Pilmar*, 15 Misc 2d 91.) Christensen, however, was not just preparing to go into his own business; he was in business for himself, while drawing a salary from a trusting employer.

Christensen's defense, that his activities did not interfere with Maritime's business since Hertzwig was unwilling to sell to a Dominican Republic purchaser because of a past bad debt, was not supported by the credible evidence. Apart from Christensen's conclusory statement, which "is

evidence of nothing" (*Noce v Kaufman,* 2 NY2d 347, 353), this defense is without factual basis in the record. Christensen's own witness, a former Maritime employee, would not even support it, testifying instead that Maritime's reluctance to do business in the Dominican Republic was due to refrigeration problems. Furthermore, it strains credulity that Maritime would have refused to ship to the Dominican Republic if, as was the case here, the purchase price was paid in advance.

Assuming, *arguendo,* however, that the defense had an evidentiary basis, it would still be insufficient as a matter of law since, even if Christensen had first offered the Frutos account to Maritime, he would not be free to take the business for himself or direct it to a competitor for his profit without the express consent and approval of his employer. (*Beatty v Guggenheim Exploration Co.,* 225 NY 380, 386; *Brown Assoc. v Fileppo,* 38 AD2d 515-516.) Having ascertained that the Frutos account was available and risk free, by reason of Frutos' willingness to prepay, Christensen was obliged at least to try to secure this business for his employer. Instead, he covertly took the opportunity for himself.

The argument that the diversion of the Frutos opportunity did not harm Maritime or interfere with its business also fails since it overlooks the principle that a trusted employee is held, not to the standards of the market place, but to *uberrima fides*. It was not enough that Christensen merely refrain from harming his employer. (*Jones Co. v Burke,* 306 NY 172, 190.) He had an affirmative duty at all times to act in his employer's best interests. (*Wechsler v Bowman,* 285 NY 284, 291-292; *Bruno Co. v Friedberg,* 21 AD2d 336, 340; *Feiger v Iral Jewelry,* 41 NY2d, at p 928.) In the circumstances, whether as an employee or officer, Christensen would have had an obligation to communicate any business opportunity to Maritime. (*Volk Co. v Fleschner Bros.,* 298 NY 717; *Bruno Co. v Friedberg,* 21 AD2d, at p 340.)

While Christensen's disloyalty in the Frutos transactions is manifest, the record is less definitive on the question of whether these were isolated incidents. Trial Term found that the only sales by World-Wide prior to Christen-

sen's resignation were the five to Frutos. While these may have been the only sales that came to light, we believe the record yields much more by way of fair inference. The single dereliction rationale ignores World-Wide's purchase of $47,510 worth of fish in the weeks before Christensen's resignation and the February deposit of $20,204.36 in its account. To view this activity as merely preparatory, and in anticipation of the new venture, without any diminution of effort by Christensen in behalf of Maritime, would be unrealistic, given Christensen's withholding of World-Wide's books and records at his pretrial deposition, despite evidence of their existence, and his disregard of a subpoena and successful evasion of a second subpoena during trial. In light of the substantial purchases made in the last weeks before his resignation, equal in amount to his last year's salary, the more probable view is that Christensen utilized his time on Maritime's payroll to secure sales orders.

■■ The strongest adverse inference which the opposing evidence might permit should have been drawn against Christensen by virtue of his failure to appear and testify at the employee disloyalty trial. (*Scola v Morgan,* 66 AD2d 228, 234.) He willfully disregarded a subpoena, which, inexplicably, Trial Term refused to enforce on the ground it had expired. While the subpoena called for Christensen's presence at a court date two months earlier, it also provided for his appearance on any adjourned date. Under CPLR 2305 (subd [a]) a subpoena containing a reservation for any recessed or adjourned date is enforceable without the necessity of further process if the witness has reasonable notice of such adjourned date. That Christensen had notice of the adjourned date is beyond dispute, as evidenced by his appearance once both sides had rested in the employee disloyalty case.

■ Since we are empowered to make the finding that Trial Term should have made (*Terry & Gibson v Bank of N. Y. & Trust Co.,* 242 App Div 699) we conclude, upon the basis of the evidence presented, limited though it was, and the inferences to be drawn therefrom, that Christensen breached his trust in the periods between January and June, 1976 and during January and February, 1977, if not

during the months between as well. Thus, an accounting is warranted to ascertain the damages resulting from Christensen's diversion of business during the entire 14-month period from December, 1975, when he incorporated World-Wide, until February 11, 1977, when he resigned from Maritime. (*Defler Corp. v Kleeman,* 19 AD2d 396, 403-404, affd 19 NY2d 694.) At such accounting both defendants, Christensen and World-Wide, will have to disclose the full extent of Christensen's activities during the period in question. The complaint in this action was properly dismissed as against the other defendants, Christensen's wife and his father-in-law, now deceased.

Maritime, as already noted, is entitled to the return of any compensation paid Christensen during the period of disloyalty. (*Lamdin v Broadway Surface Adv. Corp.,* 272 NY, at p 138; *Defler Corp. v Kleeman,* 19 AD2d, at p 404; *Feiger v Iral Jewelry,* 41 NY2d, at p 928.) In addition, it is entitled to damages for the wrongful diversion of its business measured by the "opportunities for profit on the accounts diverted from it through defendants' conduct." (*Jones Co. v Burke,* 306 NY, at p 192.)

Accordingly, the judgment, Supreme Court, Bronx County (JIUDICE, J.), entered November 19, 1982, dismissing the complaint in the trade infringement action should be affirmed without costs or disbursements. The judgment of the same court and date dismissing the complaint in the employee disloyalty action should be modified, on the law and the facts, with costs and disbursements, to the extent of reinstating the complaint as against defendants Roy Christensen and World-Wide Fish Products, Inc., finding them liable to plaintiff and remitting the matter to the Supreme Court, Bronx County, for an accounting to ascertain the damages resulting from Christensen's diversion of business during the period between December, 1975 and February 11, 1977, and, except as thus modified, affirmed.

Ross, Asch, Bloom and Alexander, JJ., concur.

Judgment, Supreme Court, Bronx County, entered on November 19, 1982, dismissing the complaint in the trade infringement action, unanimously affirmed, without costs and without disbursements, and it is further ordered that the judgment of said court, entered on November 19, 1982,

dismissing the complaint, in the employee disloyalty action, is unanimously modified, on the law and the facts, to the extent of reinstating the complaint as against defendants Roy Christensen and World-Wide Fish Products, Inc., finding them liable to plaintiff and remitting the matter to the Supreme Court, Bronx County, for an accounting to ascertain the damages resulting from Christensen's diversion of business during the period between December, 1975 and February 11, 1977, and, except as thus modified, affirmed, with $75 costs and disbursements of this appeal payable to appellant by the respondents.