ALEXANDER & ALEXANDER OF NEW YORK, INC., Plaintiff, and ALBERT G. RUBEN & CO. (NEW YORK), INC., Appellant, v HARRY W. FRITZEN, JR., et al., Respondents.

First Department, June 8, 1989

APPEARANCES OF COUNSEL

*Christopher B. Hitchcock* of counsel *(Ohrenstein & Brown,* attorneys), for appellant.

*Spiros A. Tsimbinos* of counsel *(Jerome S. Ventura* for Harry W. Fritzen, Jr., and another; *Joseph J. Filardi, P. C.,* for James W. Barber; *Albert G. Kraut, P. C.,* for Paul Bikoff and others), respondents.

## OPINION OF THE COURT

SMITH, J.

The central questions raised on this appeal are (1) whether the record supports the granting by the motion court of the defendants' motion for partial summary judgment and (2) whether the individual defendants, all former employees of plaintiff insurance brokerage firm, diverted "corporate opportunities" in the form of life insurance business from plaintiff to the corporate defendants which the former employees controlled.

Plaintiff Albert G. Ruben & Co. (New York), Inc. (AGR or the Ruben firm) is a licensed insurance brokerage firm (Insurance Law § 2104) specializing in procuring commercial property and casualty insurance for the entertainment industry. Its major client is Warner Communications, Inc. (Warner) a leading member of the motion picture industry. AGR is owned by the California based Albert G. Ruben & Co. which in turn is owned by coplaintiff Alexander & Alexander of New York, Inc. (Alexander), one of the largest brokerage firms in the world. For reasons which will be discussed, Alexander is no longer a party to this action.

Between 1979 and 1982, the time relevant to this dispute, plaintiff AGR was not licensed by the State of New York to sell life insurance.

During the early 1970's, the four individual defendants, Harry W. Fritzen, Jr. (Fritzen), Paul Bikoff (Bikoff), Mary Ann Pierro (Pierro) and James W. Barber (Barber) were all employed by Alexander. Barber left Alexander on November 1, 1976 in order to head the New York office of plaintiff AGR and shortly thereafter was instrumental in having Fritzen join him at AGR as an account executive. Bikoff left Alexander in 1976 to work for his father's insurance brokerage company, defendant Universal Economic Services, Inc. (Universal Economic), where he became a vice-president. Defen-

dant Universal Economic is engaged in the business of life and health insurance and pension consulting.

On June 30, 1978, Barber resigned from AGR to become the risk manager for Warner Communications, Inc. (Warner) where he was responsible for purchasing all of Warner's insurance through various brokers and agents. Fritzen succeeded Barber as head of plaintiff AGR's New York office.

In March of 1980 upon the recommendation of Barber, who was still at Warner, defendant Bikoff was hired by AGR and assigned to work on its account with Warner. Plaintiff claims Bikoff's title was account executive, while Bikoff claims that he was only a part-time insurance policy checker. The record is unclear as to whether at that time AGR was aware that Bikoff retained his position as vice-president of Universal Economics. In November of 1980, defendant Pierro was hired as an assistant account executive with AGR, also apparently at Barber's suggestion. She also was assigned to the Warner account.

Without advising AGR of Warner's need for life insurance for its executives and employees, defendants Fritzen and Bikoff began in 1979 to place life insurance policies with defendant Universal Economics, earning in excess of $750,000 in commissions.

On January 2, 1979, Fritzen and Bikoff formed defendant Trans Atlantic Brokerage Corporation (Trans Atlantic) with Fritzen as president and Bikoff as vice-president. On April 12, 1979, Trans Atlantic became licensed by the New York State Insurance Department as a property/casualty insurance broker. Thereafter, while still employed by the Ruben firm and without its knowledge, Fritzen and Bikoff, through Trans Atlantic, allegedly began to siphon off property/casualty business from AGR.

AGR commenced this action in March of 1983, alleging in relevant part in its first cause of action diversion of "corporate opportunities" between April 2, 1979 and March 1982 and seeking damages for commissions earned by defendants on both diverted life insurance and property/casualty insurance policies; in its second cause of action, misrepresentation and the return of compensation paid to employee defendants; in its third cause of action, breach of fiduciary duty and requesting imposition of a constructive trust over the allegedly diverted life insurance commissions; in its fourth cause of action, breach of fiduciary duties with respect to the life insurance

commissions; in its fifth cause of action, as against Barber, interference with plaintiff's contractual relationship with its employees Bikoff and Fritzen; and in its sixth and seventh causes of action against Barber, prima facie tort and injurious falsehood.[1] The eighth through tenth causes of action sought the return of certain expense payments and equipment loaned to defendants Pierro, Bikoff and Barber.

In answer to AGR's complaint the defendants, *inter alia,* asserted as an affirmative defense that the Ruben firm was not licensed to sell life insurance at the relevant times and therefore lacked capacity to sue for recovery of life insurance commissions. Apparently in recognition of this possible defense, coplaintiff Alexander, which had a brokerage license to sell life insurance in New York, in 1984 commenced an almost identical action against the same defendants (the Alexander action). The complaint in the Alexander action as against Fritzen and Pierro was dismissed for lack of standing by order of the Supreme Court, New York County (Greenfield, J.), dated October 1, 1984. The Alexander complaint as to Barber was dismissed by this court on appeal *(Alexander & Alexander v Fritzen,* 114 AD2d 814 [1985], *affd* 68 NY2d 968 [1986]), with the balance of the Alexander action consolidated with the AGR suit. This court found that Alexander as a corporate parent or affiliate of AGR, both being separate entities, had no standing to assert claims of wrongdoing suffered by AGR. Thereafter, by stipulation dated December 4, 1986, the Alexander action was discontinued.

In December of 1986, all defendants in the AGR suit moved to dismiss that complaint on the grounds that a defense was founded upon documentary evidence, that plaintiff had no legal capacity to sue and that the pleadings failed to state a cause of action (CPLR 3211 [a] [1], [3], [7]). Alternatively, the defendants sought summary judgment. (CPLR 3212.) In support of the motion, defendants relied almost exclusively on the admission by an attorney for AGR that between 1979 and 1982 AGR had no life insurance brokerage license as required by section 2104 of the Insurance Law. Therefore, the defendants argued, since AGR could not legally earn commissions on the sale of life insurance policies, it had no standing to sue. AGR opposed the motion and cross-moved for partial sum-

---

1. The sixth and seventh causes in the AGR suit were dismissed as to defendant Barber by order of the Supreme Court, New York County (Greenfield, J.), dated May 17, 1985.

mary judgment on its first, third and fourth causes of action against Bikoff, Fritzen, Trans Atlantic and Universal, urging that had the employee defendants notified it of the Warner "business opportunity", it easily could have obtained the required license and lawfully earned the commissions. Specifically, the firm's vice-president asserted that having at least two individuals on its staff licensed as life insurance brokers, it merely had to file for a life insurance brokerage license, the grant of which was "but a formality". AGR also presented evidence that in 1980 it had established a 50% fee-splitting arrangement with an independent licensed life insurance agent whereby the agent would follow up on leads given to him by AGR and share with AGR commissions generated by such referrals.

The motion court dismissed the third through seventh causes of action in their entirety and dismissed the first and second causes to the extent that they sought damages for diversion of life insurance business, finding that AGR's lack of a corporate life insurance license precluded it from taking advantage of any life insurance "business opportunities" and that the fee-splitting arrangement was unlawful. (Insurance Law § 2114.)

It is this determination by the motion court which is before us for review. While affirming, we do so for reasons other than those given by the motion court.

The doctrine of "corporate opportunity" provides that corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation. (Brudney and Clark, *A New Look at Corporate Opportunities,* 94 Harv L Rev 997, 998 [1981]; *see also, Jones Co. v Burke,* 306 NY 172, 187-189 [1954]; *Blaustein v Pan Am. Petroleum & Transp. Co.,* 293 NY 281, 300 [1944]; *Poling Transp. Corp. v A & P Tanker Corp.,* 84 AD2d 796, 797 [2d Dept 1981].) The obligation of loyalty implied by the relationship between an employee and his (her) employer rests upon the rule that a person who undertakes to act for another shall not in the same matter act for himself (herself). *(Maritime Fish Prods. v World-Wide Fish Prods.,* 100 AD2d 81, 87-88 [1st Dept 1984], *appeal dismissed* 63 NY2d 675; *Foley v D'Agostino,* 21 AD2d 60, 66-67 [1st Dept 1964]; *Marshall v Sackett & Wilhelms Co.,* 181 App Div 157, 158 [2d Dept 1917]; 52 NY Jur 2d, Employment Relations, § 205.)

Just what constitutes a corporate opportunity and whether the sale of life insurance in this case is a "corporate opportunity" are the critical inquiries herein.

■ At the outset, we note that plaintiff's lack of a life insurance brokerage license during the relevant periods and consequent inability to lawfully earn commissions from the sales of such policies does not, ipso facto, warrant the conclusion that the sale by the defendants of life insurance was not the diversion of a "corporate opportunity". In *Foley v D'Agostino (supra,* 21 AD2d, at 67-68 [1st Dept 1964], citing 54 Harv L Rev 1191, 1199), we stated: " 'the fact that the competing business undertaken presented itself in the form of a corporate opportunity which the corporation was financially unable or for other reasons unwilling to undertake should be no excuse for an officer undertaking it individually. Despite the corporation's inability or refusal to act it is entitled to the officer's undivided loyalty' ".

It would be imprudent to hold that employees and corporate officers could exploit opportunities solely on the grounds of the legal inability of a corporation, especially if the claimed inability may be easily eliminated, for availability of the defense of corporate inability reduces the incentive for executives to seek effective solutions to corporate problems. Knowledge as to whether a business was financially able to make an acquisition or legally capable of undertaking a particular venture, or whether the corporation could have easily overcome either disability, if one did exist, is generally within the unique knowledge of the diverting fiduciary or employee. Permitting claims of disability to become the subject of judicial controversy when they can only be disproven by others with great difficulty and at considerable expense is to encourage employees and fiduciaries to divert corporate opportunities knowing that the diversion may not be effectively challenged. (Brudney and Clark, *op. cit.,* 94 Harv L Rev, at 1021-1022.)

Various tests have been utilized to determine whether a venture should be considered a "corporate opportunity". One such method, and the one frequently employed in this jurisdiction, is whether the corporation has an "interest" or "tangible expectancy" in the opportunity. *(Blaustein v Pan Am. Petroleum & Transp. Co., supra,* 293 NY, at 300 [1944]; *Meinhard v Salmon,* 249 NY 458 [1928]; *Burg v Horn,* 380 F2d 897, 899 [2d Cir 1967]). An "interest" or "tangible expectancy" has been explained as something "much less tenable than ownership",

but, on the other hand, more certain than a "desire" or a "hope". *(See,* Brudney and Clark, *op. cit.,* 94 Harv L Rev, at 1013-1014.)

In *Burg v Horn (supra),* the Second Circuit described the interest or tangible expectancy test in this way: "[Interest or tangible expectancy] clearly expresses the judgment that the corporate opportunity doctrine should not be used to bar corporate directors from purchasing any property which might be useful to the corporation, but only to prevent their acquisition of property which the corporation needs or is seeking, or which they are otherwise under a duty to the corporation to acquire for it" *(supra,* 380 F2d, at 899).

Thus, a second test has been whether an opportunity is the same as or is "necessary" for, or "essential" to, the line of business of the corporation. If the opportunity is the same as or related to the employer's line of business and the consequences of deprivation are so severe as to threaten the viability of the enterprise, the officer or employee is deemed to have violated his fiduciary responsibility. *(See, Meinhard v Salmon, supra; Bruno Co. v Friedberg,* 28 AD2d 91 [1st Dept 1967], *later appeal* 23 NY2d 798 [1968]; *Nassau Soda Fountain Equip. Corp. v Mason,* 118 AD2d 764 [2d Dept 1986]; *see also, Burg v Horn, supra,* 380 F2d, at 899-900.) The sale of life insurance in this case clearly was not necessary to the viability of AGR.

A third method has been to examine whether at the beginning of the employment or fiduciary relationship the parties understood, or it is reasonable to conclude. that the parties understood, that the employee, officer or director would simultaneously pursue other interests, even ones related to or in direct competition with the business of the corporation. *(See, Burg v Horn, supra,* 380 F2d, at 900.) The record does not reveal the existence of any such understanding.

It appears that none of these tests alone is consistently sufficient to answer the question of what constitutes a "corporate opportunity". While the cases in this jurisdiction have generally announced reliance on the "interest or tangible expectancy" test, in some instances consideration has been given to the other tests. Some cases refer to all relevant factors. *(See, i.e., Burg v Horn, supra,* 380 F2d, at 900.)

■ The facts of the instant case warrant the conclusion that the sale of life insurance by the employee defendants was not the diversion of a "corporate opportunity" belonging to AGR.

Although not determinative, it is significant that between 1978 and 1984 plaintiff held no license which authorized it to sell life insurance in this State. Plaintiff's evidentiary presentation in opposition to the motion for summary judgment disclosed that it was aware of the profitable opportunity to service the life insurance needs of its property/casualty clients and more specifically Warner. The commission-splitting arrangement it established in 1980, however, was unlawful (Insurance Law § 2114). While this legal incapacity did not by itself relieve the employee defendants of their obligation to inform plaintiff of such opportunity (see, i.e., Maritime Fish Prods. v World-Wide Fish Prods., supra, at 89 [1st Dept 1984], and Bruno Co. v Friedberg, supra, 21 AD2d, at 340), it is significant that in opposition to summary judgment plaintiff failed to offer any evidence that the defendant employees were advised of that arrangement or of the employer's interest in such life insurance business.[2]

We reject as overbroad plaintiff's interpretation of a "business opportunity" as that which embraces areas into which the corporation could naturally or easily expand. It is essentially the employer's prerogative, not the employee's, to make the strategic decision to expand into a related but new line of business and to convey this to its employees. Irrespective of knowledge of a particular customer's need for the related product or service, the employer should be the one to determine whether or not to expand. Without any indication from the employer, an employee simply has insufficient guidance to render it appropriate for him (her) to bear the risk of the employer's later claim against him (her) based upon an undeclared intent.

Here, AGR made no showing of an expectancy, tangible or otherwise, in the life insurance business, that such business was essential or necessary to its success, or even that there was a likelihood that had defendants not obtained such life insurance business, such business would have been realized by it.

█ This does not mean that plaintiffs have no valid claim against employee defendants. Evidence of their lack of the utmost good faith owed to their employer (see, Maritime Fish

2. Plaintiff was clearly aware of this factual issue since in its complaint, it alleged that it had made a "major well-known effort" to attract life insurance business. However, on the summary judgment motion no facts at all were adduced to support that claim.

*Prods. v World-Wide Fish Prods., supra,* 100 AD2d, at 87-88) is plainly presented in this case. Defendants' secretiveness was hardly accidental, as confirmed by their undenied diversion of lesser amounts of property/casualty business, clearly a "business opportunity", to the defendant Trans Atlantic Brokerage Corporation.

AGR further argues that the third and fourth causes of action should not have been dismissed in their entirety but that those parts which relate to diversion of property/casualty insurance should have remained in the case, as the court did with the first two causes of action. However, a reading of the complaint reveals the court's disparate treatment of the two sets of causes of action was completely justified as the third and fourth causes of action explicitly relate solely to life insurance.

■ AGR argues that the motion court also erred in dismissing its fifth cause of action against Barber, risk manager for Warner at all relevant times, for intentional interference with plaintiff's contractual relationship with its employees Fritzen and Bikoff. This argument is without merit and indeed was rejected in dicta by this court on the prior appeal involving co-plaintiff Alexander & Alexander, *(supra,* 114 AD2d, at 816, *affd* 68 NY2d 968). Because Barber was a Warner employee, entitled to seek out the best interest of his employer even to AGR's disadvantage, a claim for intentional interference with contractual relations pertaining to the life insurance business, a prospective economic advantage of plaintiff at best, would require proof of improper means or malice. *(Guard-Life Corp. v Parker Hardware Mfg. Corp.,* 50 NY2d 183, 194 [1980].) No such proof was provided here.

Finally, it is noted that plaintiff has abandoned its arguments with respect to the validity of the sixth and seventh causes of action for prima facie tort and injurious falsehood in recognition of the fact that these claims were previously dismissed by order of the Supreme Court, New York County (Greenfield, J.), entered on or about March 25, 1985. No appeal from that order was ever taken by plaintiff.

Accordingly, order of the Supreme Court, New York County (William P. McCooe, J.), entered August 17, 1987 which denied the motion of the plaintiff Albert G. Ruben & Company (New York) Inc. for partial summary judgment and granted defendants' motion for partial summary judgment should be affirmed, without costs.

MURPHY, P. J., SULLIVAN, CARRO and MILONAS, JJ., concur.

Order, Supreme Court, New York County, entered on August 17, 1987, unanimously affirmed, without costs and without disbursements.