OPINION OF THE COURT
Shirley Werner Kornreich, J.
Motion sequence numbers 020 and 021 are consolidated for disposition.
Plaintiff Luba Mosionzhnik moves for partial summary judgment on the second and twelfth causes of action in the amended complaint (the AC) pursuant to CPLR 3212. (Sequence No. 020.) Defendants Ezra Chowaiki, David E. R. Dangoor, Todd Hutcheson, and Chowaiki & Co. Fine Art Ltd. (collectively, with defendant Chowaiki Mosionzhnik Gallery Ltd., the Gallery)[1] move for partial summary judgment on the Gallery’s first and third counterclaims and on the second and seventh through eleventh causes of action in the AC. (Sequence No. 021.) The motions are granted in part and denied in part for reasons that follow.
I. Procedural History
On July 20, 2009, Mosionzhnik commenced this action against defendants alleging substantial wrongdoing in connection with an art gallery in which she was a shareholder and employee. Mosionzhnik’s operative pleading, the AC, was filed on May 14, 2010. The AC contains 13 causes of action: (1) oppressive conduct towards a minority shareholder; (2) a declaratory judgment regarding Mosionzhnik’s equity interests in the defendant companies; (3) Racketeer Influenced and Corrupt Organizations *825 Act (RICO) claims; (4) defamation; (5) fraud; (6) an accounting; (7) breach of contract (the shareholders agreement); (8) breach of contract (the employment agreement); (9) breach of fiduciary duty; (10) breach of the covenant of good faith and fair dealing; (11) tortious interference with current and prospective business advantages; (12) conversion; and (13) unjust enrichment. On July 7, 2010, defendants filed their answer, in which the Gallery asserts five counterclaims: (1) breach of contract; (2) fraud; (3) breach of fiduciary duty; (4) conversion; and (5) unjust enrichment. After extensive discovery, the instant partial summary judgment motions were filed on January 28, 2013.
II. Factual Background
The Gallery was formed on January 14, 2005, when the parties executed a shareholders’ agreement for Chowaiki Mosionzhnik Gallery Ltd. (the shareholders’ agreement) and virtually identical employment agreements for Mosionzhnik (the employment agreement) and Chowaiki. The shareholders’ agreement states that the Gallery’s three shareholders are Mosionzhnik and Chowaiki, who were each issued 250 shares, and Dangoor, who was issued 500 shares. All three are named directors. Chowaiki is designated the president, and Mosionzhnik is designated the vice-president and secretary. They each were paid an annual base salary of $120,000. Dangoor, who was not an employee of the Gallery, received 50% percent of the shares because he provided seed capital to the Gallery. Defendant Hutcheson now is an employee of the Gallery.
The shareholders’ agreement provides that upon the termination of Mosionzhnik’s (or any employee who owned stock, such as Chowaiki) employment, Mosionzhnik would have to sell her shares to the Gallery. Section 4.2 provides that “the price shall be the fair market value of the shares of stock to be sold determined by the accountants servicing the [Gallery] using generally accepted accounting principles, consistently applied.”
On July 23, 2008, Mosionzhnik was summoned to a meeting by Chowaiki and Dangoor at which Mosionzhnik was accused of myriad improprieties in connection with her employment with the Gallery and fired for cause.[2] In a letter dated October 20, 2008, the Gallery notified Mosionzhnik that it had valued her shares at $170,000. The Gallery had retained an accounting firm, Holtz Rubenstein Reminick (Holtz), which issued a report *826 (the Holtz report) that valued Mosionzhnik’s shares as of July 23, 2008. The Gallery further notified Mosionzhnik that she would not receive any money for the shares because the amount she stole from the Gallery exceeded the value of her shares. This action followed.
Mosionzhnik has admitted to committing the most egregious of the alleged improper acts. She secretly opened a Swiss bank account which she used to divert approximately $500,000 related to the Gallery’s art sales[3] and used over $13 million of art consigned by the Gallery’s clients as collateral for loans without the clients’ knowledge or consent. Rather than deny or present evidence to refute these allegations, at her deposition, Mosionzhnik testified that her actions were not improper and noted that “plenty of advisors . . . take a kickback . . . That’s not ethical but it happens because it’s the art world.” With respect to illegally using client art as collateral, her defense is that Chowaiki also did so and told her that such a thing was accepted practice in the industry (despite the AC waxing poetic about Mosionzhnik being “an internationally acclaimed and renowned” art dealer, while Chowaiki supposedly was merely an “unsuccessful screenwriter” and ice cream salesman with “no formal education or expertise in art”). As discussed infra, these actions warrant summary judgment on liability. However, as discussed infra, Mosionzhnik’s bad acts[4] do not destroy her right to receive the proper value of her shares pursuant to the terms of the shareholders’ agreement. Consequently, the central dispute on these motions is whether the Holtz report complied with section 4.2 of the shareholders’ agreement. Mosionzhnik’s main objection to the Holtz report is that it did not account for the Gallery’s interest in litigation it is funding in Europe (referred to by the parties and hereinafter as Project Gamma).
In December 2004, shortly before the formation of the Gallery, Mosionzhnik and Chowaiki decided to invest in a pending *827 judicial proceeding in Switzerland and Greece. The litigation concerned the estate of a deceased Greek billionaire and his wife, who had amassed a valuable art collection that included works by Picasso and Monet. The works disappeared shortly before the wife died (her husband predeceased her by six years) and were supposedly sold in the 1980s to a Panamanian trading company for a fraction of their value. Mosionzhnik and Chowaiki agreed to fund one of the estate’s purported heiresses in her attempt to recover the artwork. If successful, Mosionzhnik and Chowaiki contracted for the right to purchase the artwork at a substantial discount, which the Gallery would then be able to sell for a multimillion dollar profit. To this end, on December 21, 2004, Chowaiki created defendant Zelco Ltd. (Zelco) to enter into said agreement with the heiress. Mosionzhnik never had a direct equity interest in Zelco. Zelco was never operated as an independent company, its finances were completely commingled with the Gallery’s, and the Gallery directly funded Project Gamma. Thus, Mosionzhnik’s and Chowaiki’s interest in Project Gamma is no more than their equity interest in the Gallery.[5]
III. Summary Judgment Motions
It is well established that summary judgment may be granted only when it is clear that no triable issue of fact exists. (Alvarez v Prospect Hosp., 68 NY2d 320, 325 [1986].) The burden is upon the moving party to make a prima facie showing of entitlement to summary judgment as a matter of law. (Zuckerman v City of New York, 49 NY2d 557, 562 [1980]; Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065, 1067 [1979].) A failure to make such a prima facie showing requires a denial of the motion, regardless of the sufficiency of the opposing papers. (Ayotte v Gervasio, 81 NY2d 1062, 1063 [1993].) If a prima facie showing has been made, the burden shifts to the opposing party to produce evidentiary proof sufficient to establish the existence of material issues of fact. (Alvarez, 68 NY2d at 324; Zuckerman, 49 NY2d at 562.) The papers submitted in support of and in opposition to a summary judgment motion are examined in the light most favorable to the party opposing the motion. (Martin v Briggs, 235 AD2d 192, 196 [1st Dept 1997].) Mere conclusions, *828 unsubstantiated allegations, or expressions of hope are insufficient to defeat a summary judgment motion. (Zuckerman, 49 NY2d at 562.) Upon the completion of the court’s examination of all the documents submitted in connection with a summary judgment motion, the motion must be denied if there is any doubt as to the existence of a triable issue of fact. (Rotuba Extruders v Ceppos, 46 NY2d 223, 231 [1978].)
A. Mosionzhnik’s Motion (Sequence No. 020)
As discussed supra, part II, Mosionzhnik has no stand-alone interest in Project Gamma. Rather, her interest is through her equity in the Gallery. Hence, defendants are granted summary judgment and her claim for a declaratory judgment that she continues to own a 25% interest in Project Gamma is dismissed.
As for Mosionzhnik’s conversion claim, such claim was withdrawn pursuant to a pair of recently filed stipulations dated July 22, 2013 (NY St Cts Electronic Filing [NYSCEF] Doc. Nos. 305, 306, https://iapps.courts.state.ny.us/webcivil/FCASMain [complete CAPTCHA, search by case index No. 650434/2009, click on index No. hyperlink, then click on “Show eFiled Documents”]), which set forth that defendants returned Mosionzhnik’s artwork in exchange for some of the works allegedly owned by defendants. Defendants’ conversion counterclaim, which is not at issue on the instant motions, is now limited to the eight works set forth in the second stipulation (see NYSCEF Doc. No. 306 at 3).
B. Defendants’ Motion (Sequence No. 021)
Defendants seek summary judgment on the following claims: (1) the Gallery’s counterclaim for breach of contract; (2) the Gallery’s counterclaim for breach of fiduciary duty; (3) Mosionzhnik’s claim for a declaratory judgment; (4) Mosionzhnik’s claim for breach of the shareholders’ agreement; (5) Mosionzhnik’s claim for breach of the employment agreement; (6) Mosionzhnik’s claim for breach of fiduciary duty; (7) Mosionzhnik’s claim for breach of the covenant of good faith and fair dealing; and (8) Mosionzhnik’s claim for tortious interference with current and prospective business advantages. As discussed above, Mosionzhnik’s claim for a declaratory judgment is dismissed.
1. Breach of Fiduciary Duty
A fiduciary duty arises from a relationship of higher trust that creates an obligation to act for or give advice to another upon matters within the scope of the relation. (EBC I, Inc. v *829 Goldman, Sachs & Co., 5 NY3d 11, 19 [2005].) It is well established that corporate directors have fiduciary duties to the corporation, including the duty of good faith, due care, and loyalty. (Matter of Levandusky v One Fifth Ave. Apt. Corp., 75 NY2d 530, 538 [1990].) As directors, both Mosionzhnik and Chowaiki had fiduciary duties to the Gallery, which they accuse each other of breaching by committing fraud and engaging in a variety of illegal self-dealing schemes. These accusations fall into two categories: diversion of corporate opportunities and flat-out illegal activity. The former merits summary judgment for the Gallery. The latter, however, is barred by the doctrine of in pari delicto.
Mosionzhnik contends that she should be permitted to keep the $500,000 that she secretly transferred to a Swiss bank account because section 6 (c) of the shareholders’ agreement permits her to engage in private art transactions for her own, personal benefit. If the deals that led to her procuring the money were her own, private deals, she would be entitled to keep the money. However, the record establishes that all of the money was related to the Gallery’s transactions. Mosionzhnik was the Gallery’s liaison to its Russian clients, and it was she who invoiced them and directed them how to pay the Gallery. Mosionzhnik did nothing wrong by utilizing the services of a broker in Russia and paying him a “finder’s fee” for procuring deals on behalf of the Gallery. Nevertheless, taking a kickback on that finder’s fee is legally impermissible, even if such a practice is pervasive in the art industry. Calling a kickback a “gift” does not sanitize it.
Consequently, Mosionzhnik must pay the $500,000 in kickbacks to the Gallery because “fiduciaries must disgorge all wrongful benefits obtained by their disloyalty.” (212 Inv. Corp. v Kaplan, 16 Misc 3d 1125[A], 2007 NY Slip Op 51577[U], *9-10 [Sup Ct, NY County 2007]; see also Excelsior 57th Corp. v Lerner, 160 AD2d 407, 408-409 [1st Dept 1990] [“where claims of self-dealing and divided loyalty are presented, a fiduciary may be required to disgorge any ill-gotten gain even where the (company) has sustained no direct economic loss”], citing Diamond v Oreamuno, 24 NY2d 494 [1969].) Pursuant to CPLR 3212 (e) (2), the execution of the $500,000 judgment is stayed pending the conclusion of the trial because of Mosionzhnik’s potential setoffs (i.e., the claims not at issue on these motions, such as defamation). (See Bartfield v RMTS Assoc., 283 AD2d 240, 241 [1st Dept 2001].)
*830 2. Fraud
Recovery on the remaining improprieties of which Mosionzhnik and Chowaiki accuse each other is barred by the doctrine of in pari delicto. This doctrine “mandates that the courts will not intercede to resolve a dispute between two wrongdoers.” (Kirschner v KPMGLLP, 15 NY3d 446, 464 [2010].) That Chowaiki’s allegations are pleaded as counterclaims by the Gallery against Mosionzhnik is irrelevant because both of their actions are imputed to the Gallery.
“Agency law presumes imputation even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud.” (Kirschner, 15 NY3d at 465.) Imputation “is a legal presumption that governs in every case, except where the corporation is actually the agent’s intended victim.” (Id. at 466.) This exception is called the “adverse interest exception,” and applies only where the agent has “totally abandoned his principal’s interests and [is] acting entirely for his own or another’s purposes. It cannot be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal.” (Id. [citation and internal quotation marks omitted].)
[2] Here, the record unequivocally establishes that the legality of the Gallery’s business practices ranged from the questionable (the champertous funding of European litigation) to the impermissible (using client property as loan collateral). The Gallery cannot recover against Mosionzhnik for her bad acts because the Gallery benefitted from them.[6] *8 Indeed, much of the Gallery’s Russian business during Mosionzhnik’s tenure was predicated on all sorts of shady practices. Mosionzhnik, however, cannot be said to have “totally abandoned [the Gallery’s] interests” and was not “acting entirely for [her own purposes].” (Id.) Instead, Mosionzhnik’s business decisions, regardless of their wisdom, were made both for her benefit (as she was skimming commissions) and for the benefit of the Gallery (because *831 she actually procured millions of dollars in sales). There is also no question of fact that Chowaiki knew of the questionable nature of Mosionzhnik’s conduct, even if he did not know every detail or the extent to which the Gallery’s sales to Russian clients were predicated on business practices that are considered untoward in this country. Such practices may very well be the cost of doing business in Russia. The Gallery cannot reap the benefits of Mosionzhnik’s bad acts when times are good and later protest when its relationship with her soured. As a result, Mosionzhnik’s actions are imputed to the Gallery, precluding it from suing her for losses arising from those actions.
Likewise, the questions of fact about whether Chowaiki’s alleged wrongdoing rose to the level of severity of Mosionzhnik’s actions are irrelevant. Mosionzhnik lacks standing to sue Chowaiki for breaching his fiduciary duties to the Gallery because such a claim is derivative and belongs to the Gallery. (See Yudell v Gilbert, 99 AD3d 108, 113-114 [1st Dept 2012]; accord Tooley v Donaldson, Lufkin & Jenrette, Inc., 845 A2d 1031, 1033 [Del 2004].)[7] However, even if Mosionzhnik could maintain such a claim, it, nonetheless, would be barred by the in pari delicto doctrine for the same reasons that the Gallery’s claims are precluded.
3. Breach of the Employment Agreement
[3] Even though there can be no recovery for the abovementioned bad acts because of the in pari delicto doctrine, the undisputed fact that Mosionzhnik committed them (along with her stealing $500,000 from the Gallery, for which she is liable) precludes her from claiming any further compensation from the Gallery.[8] It is well established that an employee who “act[s] in any manner inconsistent with his agency or trust” and fails “to exercise the utmost good faith and loyalty in the performance of his duties” is deemed a “faithless servant” and “must ... account to his principal for secret profits [and] forfeit[ ] his right to compensation.” (Lamdin v Broadway Surface Adv. Corp., 272 NY 133, 138 [1936]; Visual Arts Found., Inc. v Egnasko, 91 AD3d 578, 579 [1st Dept 2012].) Therefore, Mosionzhnik’s claim *832 for further compensation from the Gallery is dismissed. (See Bon Temps Agency v Greenfield, 184 AD2d 280, 281 [1st Dept 1992], citing Maritime Fish Prods. v World-Wide Fish Prods., 100 AD2d 81 [1st Dept 1984].)
4. Breach of the Shareholders’ Agreement
That being said, Mosionzhnik is still entitled to be paid the fair market value of her shares pursuant to section 4.2 of the shareholders’ agreement. The right to be paid for her equity is not impaired by her bad acts because her equity is not compensation for her services and not dependent on her job performance. Indeed, her right to receive cash for her shares is only triggered upon her termination. Neither the shareholders’ agreement nor the employment agreement distinguishes between termination for or without cause. This is unsurprising because Mosionzhnik’s employment was at-will.[9] Ergo, the basis for her termination has no impact on her right to receive money for her shares.
As a result, the court must reach the essential inquiry in this case of whether the value of Mosionzhnik’s shares exceeds her liability to the Gallery. Based on the discussion above, it would appear that the question is simple: are her shares worth more than $500,000? The relevant inquiries are: (1) whether the Holtz report is a reflection of the fair market value of the shares based on generally accepted accounting principles; and (2) should Project Gamma be accounted for in the valuation of the Gallery?
As discussed supra, part II, the Gallery retained Holtz to value Mosionzhnik’s shares. The Holtz report, which was issued on October 20, 2008, used a calculation engagement methodology to determine that her shares were worth $170,000 as of July 23, 2008. Mosionzhnik objected to this valuation and hired her own expert, Gettry Marcus Stern & Lehrer, CPA, PC. (GMSL), which issued a report on August 19, 2011, using a valuation engagement methodology to conclude that her shares were worth $4,317,200 as of July 23, 2008.
*833 Neither Holtz nor GMSL ascribed a positive value to Project Gamma. To wit, GMSL considered Project Gamma to be an “Abandoned Project”[10] and recognized that the Gallery spent over $3.4 million on it, including over $2.4 million in legal expenses that it paid to a Paris-based attorney who conducted the litigation in Europe. Despite her own expert declining to increase the valuation of the company based on the expected value of Project Gamma, Mosionzhnik still contends that Holtz erred in failing to account for it. This court will not disregard the dueling reports’ point of agreement — that it is not improper to omit the expected value of Project Gamma from the valuation of the Gallery.
Mosionzhnik’s only other basis to disregard the Holtz report is her contention that it improperly utilized a calculation engagement instead of a valuation engagement. This objection is inapposite because both are generally accepted accounting principles. If, however, Mosionzhnik had pointed out real error in the valuation, such as misstating amounts in the Gallery’s financial statements, the inquiry might be different. She did not. The shareholders’ agreement does not provide her the right to procure her own report if she disagrees with the Gallery’s valuation. In light of the evidence of how the Gallery does business, it is unsurprising (aside from the usual expectation that the experts of adverse parties will disagree) that Holtz and GMSL came to drastically different conclusions about the value of the Gallery. Regardless, the court must accept the Holtz report because it was prepared in accordance with the terms of the shareholders’ agreement. If the parties, who constitute all of the involved individuals that formed the Gallery and drafted the shareholders’ agreement, wished to grant a terminated employee a more substantive right to participate in or challenge the valuation of her shares, they could have drafted the shareholders’ agreement differently. As they did not, they are bound by the express term of the shareholders’ agreement they all agreed to. Defendants followed the protocol set forth in sec *834 tian 4.2 and thus are not obligated to pay Mosionzhnik any more than the $170,000 calculated in the Holtz report.[11]
D. Issues for Trial
In searching the record, the court sua sponte grants summary judgment and dismisses Mosionzhnik’s oppressive conduct towards a minority shareholder, RICO,[12] accounting, and unjust enrichment claims, and also dismisses the Gallery’s unjust enrichment claim. Defendants’ conduct complied with the governing written agreements and there is no question of fact that these claims are refuted by the evidence or are otherwise duplicative of the parties’ breach of contract claims. These claims are dismissed.
However, questions of fact preclude summary judgment on Mosionzhnik’s claims for defamation and tortious interference and the Gallery’s remaining breach of contract claims (which essentially allege similar allegations, such as wrongfully competing with the Gallery’s clients). It should be noted that truth is “a complete defense” to a defamation claim. (Panghat v New York Downtown Hosp., 85 AD3d 473, 473 [1st Dept 2011].) So, even though many of the parties’ fraud allegations are barred by the in pari delicto doctrine, the facts about such alleged fraud might still be addressed at trial because the truth of those allegations are at the heart of how each side allegedly defames the other and seeks to destroy the other’s reputation in the art industry. These types of allegations, made in a public trial, often have the potential for significant reputational harm for all participants, regardless of who obtains a favorable verdict. Given the net judgment before trial ($330,000 in favor of the Gallery), the limited potential for further recovery for either *835 side on the remaining allegations, the significant costs of a trial, and the associated reputational risks, the parties are directed to mediation so that a final resolution may be reached. Should the mediation fail, the parties are directed to contact the court to schedule a pretrial conference. Finally, as discussed above, the clerk will not be directed to enter any judgment until this action has been completely resolved, either after a trial or a settlement. Accordingly, it is ordered that the motions for partial summary judgment are decided as follows: (1) plaintiff Luba Mosionzhnik’s claims for oppressive conduct toward a minority shareholder, a declaratory judgment, RICO violations, fraud, an accounting, breach of contract (except for the value of her shares, discussed below), breach of fiduciary duty, breach of the covenant of good faith and fair dealing, conversion, and unjust enrichment are dismissed; (2) defendant Chowaiki Mosionzhnik Gallery Ltd.’s counterclaims for fraud and unjust enrichment are dismissed; (3) summary judgment is granted to the Gallery on its breach of fiduciary duty claim against plaintiff for the disgorgement of $500,000; (4) summary judgment is granted to plaintiff on her claim against the Gallery for payment on the value of her shares in the amount of $170,000; (5) the motions are otherwise denied; and (6) judgment is stayed pending the conclusion of the trial or the settlement of this action; and it is further ordered that the parties are directed to mediate their outstanding claims; and it is further ordered that within 30 days of the entry of this order on the NYSCEF system, the parties shall inform the court of whether they will utilize a court mediator or a private mediator; and it is further ordered that within 30 days of the conclusion of the mediation, the parties shall contact the court to schedule a pretrial conference.

. The Gallery’s name was changed after Mosionzhnik’s termination.

. Though the parties dispute the specifics of what happened at that meeting, these questions of fact are not relevant to this decision.

. She lied to the Gallery by underreporting the amount that clients agreed to pay for a work, submitted extra invoices to the clients in excess of what the Gallery invoiced, and instructed the clients to wire the excess funds to what she represented to be the Gallery’s Swiss bank account, but which was really a personal bank account.

. Mosionzhnik also is alleged to have caused the Gallery additional harm by lying about reserving the Pushkin Museum for an art exhibit (for which the Gallery spent money sending employees and clients to Russia, only to find out that there would be no exhibit at the Pushkin). In addition, after her termination, Mosionzhnik allegedly interfered with the Gallery by defaming defendants (e.g., referring to one of them with a gay slur) and violated her contractual obligations by attempting to steal the Gallery’s clients.

. Ergo, Mosionzhnik’s only theoretical avenue to recover a claimed 25% stake in Project Gamma is through the marginal amount that the present value of Project Gamma adds to the value of the Gallery. As discussed herein, neither the Holtz report nor Mosionzhnik’s own counter-report ascribed any value to Project Gamma.

. Such acts include allegations of forging wire transfers to assuage a client’s concerns about receiving payments from buyers and the odd circumstances surrounding the cancellation of a planned exhibit at the Pushkin Museum in Russia. It should be noted that, with respect to these claims and the other countless accusations that have been made since this action was commenced in 2009, the evidence demonstrates that, for the most part, the Gallery did not suffer any damages, and even profited from some of the wrongdoing. Regardless, for the reasons discussed herein, the in pari delicto doctrine precludes recovery for these actions.

. The question of whether a claim is direct or derivative “must turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?”

. In short, Mosionzhnik contends that Chowaiki was overpaid and that the Gallery had agreed to eventually pay her an equal amount.

. The at-will nature of Mosionzhnik’s employment cuts both ways. In searching the record, the court sua sponte grants summary judgment and dismisses her claim for wrongful termination because she was not fired for a discriminatory reason.

. It is undisputed that the European litigation continues to proceed. Nonetheless, the continuation of that litigation has no bearing on whether the Gallery has or will continue to fund it, if there is any real chance that the heiress will be successful in her attempt to recover the artwork, or if the Gallery will ever see any return on Project Gamma, let alone make a profit on it. Given these uncertainties, it is unsurprising that no one has attempted to calculate the present value of Project Gamma.

. The one deviation was the failure to use “the accountants servicing the Company” to obtain the valuation. However, the parties did not raise this as an issue apart from arguing that the bookkeeper (not an accountant) who apparently services the Gallery declined to do the valuation.

. Mosionzhnik’s RICO claim borders on the frivolous. Whatever lies defendants told Mosionzhnik about the Gallery’s impending bankruptcy (see AC U 59), the net result was Mosionzhnik’s sale of the Gallery’s paintings, which produced $2.5 million in profits. How this could possibly be conceived of as a bad result, let alone fraud or a RICO violation, is utterly confounding to the court. As for the rest of the RICO allegations relating to Mosionzhnik’s termination, defendants’ conduct was not illegal because they had the absolute right to fire her for any nondiscriminatory reason because she was an at-will employee. To be sure, there was ample cause to fire her for the reasons discussed herein. For Mosionzhnik to claim that she was improperly “frozen out” belies the reality of the situation. Finally, given how prejudicial an allegation of racketeering is, no reference to the RICO laws or racketeering will be permitted at trial.