■ ADIRONDACK CAPITAL MANAGEMENT, INC., Appellant-Respondent, v RUBERTI, GIRVIN AND FERLAZZO, P.C., et al., Defendants and Third-Party Plaintiffs-Respondents-Appellants. RICHARD T. CORVETTI, Third-Party Defendant-Respondent-Appellant. [842 NYS2d 603]—

Spain, J. Cross appeals from an order of the Supreme Court (Aulisi, J.), entered March 17, 2006 in Hamilton County, which, inter alia, denied defendants' motion for summary judgment dismissing the complaint.

This is a legal malpractice action commenced by plaintiff, a corporation whose president and sole shareholder is third-party defendant, Richard T. Corvetti. In 1994, plaintiff loaned $300,000 to Alice Carney and Burnell Carney, the owners of Sunnyside Nursing Home and Sunnyside Adult Home (hereinafter collectively referred to as the property) located in the Town of Manlius, Onondaga County, ostensibly for the purpose of partially satisfying federal tax liens against the property so that it could be sold. The loan was secured by a mortgage on the property and a deed to the property was to be held in escrow by defendant Salvatore Ferlazzo for use if necessary in lieu of foreclosure. In addition, the Carneys' personal residence was deeded to plaintiff for $10,000 and leased back to the Carneys with an option for the Carneys to repurchase. The loan was arranged at a meeting between Corvetti, the Carneys and others, with Corvetti using commitment documents modeled after papers that had been drafted by defendants, as plaintiff's counsel, for a prior similar transaction.

After the meeting, Corvetti contacted Ferlazzo and requested that defendants prepare for and handle the closing. A title insurance policy obtained on the property in favor of plaintiff excluded from coverage unpaid 1993 and 1994 real property taxes. Corvetti was admittedly aware that liens for unpaid property taxes would be superior to plaintiff's mortgage and that these taxes would not be paid out of the loan proceeds. At Corvetti's request, defendants provided an opinion letter which, among other things, outlined plaintiff's rights in the event of a

default by the Carneys. The opinion letter was dated the same day as the closing, September 16, 1994. According to Corvetti, upon presenting the opinion letter, Ferlazzo verbally advised him that, should the tax liens be foreclosed, plaintiff would have the opportunity to stop the property from going to auction by paying the back taxes.

Unbeknownst to any party, Onondaga County had already held a public tax sale of the property—in October 1993—based on the 1993 delinquency, and the County itself had purchased the tax sale certificate. In October 1994, at another public sale, the County purchased the tax sale certificate pertaining to the 1994 tax delinquency. The tax sale certificates were subsequently sold to Tax Certificate Associates, Inc. (hereinafter TCA). Pursuant to the Onondaga County Tax Act, TCA—as the owner of the tax certificates—was entitled, after providing the owner and mortgagees of record the proper statutory notice and opportunity to redeem, to apply for a tax deed from the County—a deed which would extinguish any mortgages on the property, including plaintiff's.

In April 1995, the Carneys defaulted on the loan. Various lawsuits ensued, resulting in a July 1996 stipulation between the Carneys and plaintiff—who were, at that point, still unaware of the tax sale—with terms designed to enable them to cooperate in the marketing and sale of the property. In accordance with that effort, it was agreed with the Carneys that plaintiff would not foreclose on its mortgage or record the escrowed deed in lieu of foreclosure. When, in November 1996, TCA sent a notice to redeem to the Carneys, the parties to this action first became aware that a tax sale had occurred prior to the closing. Corvetti then requested a second opinion letter from defendants advising him of his rights and the risks involved should he purchase the tax sale certificates from TCA personally. Defendants' December 19, 1996 letter indicated that such a purchase could be construed as interference in the stipulation between plaintiff and the Carneys which could give rise to a lawsuit for tortious interference; further, defendants advised Corvetti that a court might pierce plaintiff's corporate veil and find that, in purchasing the certificates, Corvetti had unlawfully interfered with the stipulation. Ultimately, however, defendants advised Corvetti that he had a legitimate business justification for taking the action which would amount to a defense against such possible lawsuits and that purchasing the certificates in his individual capacity was his most prudent course.

Thereafter, Corvetti and his wife purchased the tax sale cer-

tificates from TCA for $182,916 and, after a delay caused by the fact that the Carneys filed for chapter 11 bankruptcy protection, eventually obtained a deed from the County for the property. After investing an additional $475,000 in the property, Corvetti and his wife sold it, free and clear of any encumbrances, for over $1.5 million.

Plaintiff then commenced this action against defendants, essentially alleging that, at the time of the 1994 closing, defendants should have discovered that the 1993 tax sale certificate had been sold and should have advised plaintiff of the impact that the tax sale could have on plaintiff's mortgage. The complaint also alleges that defendants failed to perfect plaintiff's security interest in personal property associated with the property by failing to file a UCC financing statement, and that defendants were negligent in reading a survey of the property and failing to detect another defect in the title, namely, that the property's septic system encroached upon an adjoining parcel. Defendants answered, denying the allegations, and commenced a third-party action against Corvetti for indemnification and/or contribution, alleging that Corvetti breached his fiduciary duty to plaintiff and improperly usurped plaintiff's corporate opportunity. Defendants later moved to amend their answer to assert CPLR article 14, res judicata and collateral estoppel defenses and then moved for summary judgment dismissing plaintiff's complaint. Plaintiff cross-moved for partial summary judgment and to dismiss certain defenses, and Corvetti moved to dismiss the third-party complaint. Supreme Court, among other things, granted defendants' motion to amend their answer and denied plaintiff's and defendants' motions for summary judgment and Corvetti's motion to dismiss. All parties have appealed.

Because plaintiff has not been damaged by defendants' alleged malpractice, we conclude that defendants are entitled to summary judgment. The gravamen of plaintiff's claim is that, by the alleged malpractice, it suffered the loss of its mortgage and security interest which were intended to protect its original $300,000 investment. The value of any mortgage, however, is dependent on the value of the mortgaged property and, at best, gives the mortgagee the right to acquire ownership of the mortgaged property through foreclosure. Under the circumstances present here, we conclude that, ultimately, plaintiff was not placed in any worse position by the tax sales and the alleged malpractice of defendants than it would have been had it had the opportunity to utilize its mortgage and foreclose upon the property.

It is undisputed that prior to accepting the mortgage, plaintiff

was aware that its $300,000 loan—which carried a 16% interest rate—was a high risk transaction, as the Carneys had in excess of $1 million in judgments and liens at the time the loan was made. Indeed, the Carneys indebtedness to the Internal Revenue Service alone exceeded $955,000. Significantly, the $300,000 loan proceeds check was made directly payable to the Internal Revenue Service, which accepted this sum in partial satisfaction of the Carneys' indebtedness and agreed to subordinate its remaining liens to plaintiff's mortgage. Hence, the value of plaintiff's security interest, even before the tax certificates were sold, was impacted by the superior liens of the unpaid property taxes. Had plaintiff acquired the property through foreclosure, for example, the taxes still would have had to be satisfied, the Carney debt would have been eliminated and, as such, so would any damages to plaintiff stemming from defendants' alleged malpractice (see Central Hanover Bank & Trust Co. v Roslyn Estates, Inc., 266 App Div 244, 248-249 [1943], affd 293 NY 680 [1944]).

We must also reject plaintiff's assertion that it has, nevertheless, been damaged by the loss of its opportunity to foreclose on the mortgage because the tax sale certificates had already been sold when the Carneys defaulted, giving the holder of the certificates the right to apply for a deed free of plaintiff's mortgage. Plaintiff knew that in order to protect the mortgage, the rapidly accumulating unpaid real property tax liability would ultimately have to be satisfied. Thus, any failure by defendants to report the precise significance of the real property tax liability as of the closing is of no real consequence under these circumstances.[1] When plaintiff became aware that the tax sale certificates had been sold, an opportunity still existed to purchase them from their holder. The resulting devaluation of plaintiff's security interest was no greater than it had been as a result of plaintiff's acceptance of the mortgage with full knowledge of the outstanding tax liens. In fact, Corvetti was able to purchase the tax sale certificates from TCA in December 1996 at essentially the then current cost of satisfying the original tax liens.[2]

Thus, we conclude that the purchase of the tax sale certifi-

---

**1.** Indeed, we have previously held in related litigation that the subject tax sale certificates represent "only an inchoate right to a conveyance of the real property, which matures only in the event that the sum prescribed for redemption is not paid before the end of the redemption period and there is compliance with the notice and filing requirements of the Onondaga County Tax Act" (Corvetti v Fidelity Natl. Tit. Ins. Co. of N.Y., 258 AD2d 32, 35 [1999], lv denied 94 NY2d 753 [1999] [internal quotation marks and citations omitted]).

**2.** The County paid a total of $133,764.98 for the two tax certificates. TCA paid the County $139,782.41 plus nominal expenses. It appears that TCA did

cates and ultimate acquisition of the property would have placed plaintiff in essentially the same position that it would have been in had it been able to foreclose on the property. Plaintiff argues, however, that it remains damaged because it was Corvetti and his wife, rather than plaintiff, that ultimately took title to the property. We reject this argument because, in our view, the facts presented represent one of those rare opportunities where we are able to find, as a matter of law, that a breach of fiduciary duty occurred (*see Matter of Greenberg [Madison Cabinet & Interiors]*, 206 AD2d 963, 964 [1994]). By acquiring the property personally rather than on behalf of plaintiff, Corvetti misappropriated a corporate opportunity in breach of his fiduciary duty as president of plaintiff. Thus, any damage to plaintiff as a result of the tax sale was caused by Corvetti, rather than the alleged negligence of defendants.

As a fiduciary to plaintiff, Corvetti was prohibited from profiting personally at the expense of the corporation or promoting personal interests which were incompatible with the superior interests of the corporation (*see Howard v Carr*, 222 AD2d 843, 845 [1995]; *Bertoni v Catucci*, 117 AD2d 892, 894-895 [1986]). Likewise, a corporation's fiduciary may not divert and exploit an opportunity that should be deemed an asset of the corporation (*see Alexander & Alexander of N.Y. v Fritzen*, 147 AD2d 241, 246 [1989]); i.e., Corvetti should not have acquired property in which plaintiff had a "tangible expectancy" (*id.* at 247), something " 'which the corporation needs or is seeking, or which [he was] otherwise under a duty to the corporation to acquire for it' " (*id.* at 248, quoting *Burg v Horn*, 380 F2d 897, 899 [2d Cir 1967]).

To conclude here that Corvetti had an obligation to acquire the property on behalf of plaintiff, rather than for himself and his wife, personally, requires only to consider the nature of the transaction juxtaposed against the relationship between Corvetti and plaintiff. Given its mortgage against the subject property and the present lawsuit in which it claims injury due to the loss of the opportunity to foreclose on that mortgage, plaintiff had a tangible expectancy in acquiring title to the property.[3] Inasmuch as Corvetti and his wife were the sole sources of all capital for plaintiff, including the $300,000 loan to the

not extract a premium for its sale of the tax sale certificates to Corvetti and his wife ($182,916), but merely charged interest from the time it bought the certificates from the County plus permissible costs.

**3.** We reject plaintiff's claim that it was prohibited from purchasing the tax sale certificates by its stipulation with the Carneys. According to plaintiff, the Carneys had already breached the stipulation and, in any event, the stipu-

Carneys, Corvetti had the opportunity to fulfill his obligation to undertake the profitable purchase and resale of the property on plaintiff's behalf[4] (*see Howard v Carr, supra* at 845-846; *Matter of Greenberg [Madison Cabinet & Interiors], supra* at 964; *Bertoni v Catucci, supra* at 894-895; *cf. Moser v Devine Real Estate, Inc. [Florida]*, 42 AD3d 731 [2007]).

Instead, it was Corvetti, a sophisticated businessman who had orchestrated plaintiff's transactions with the Carneys from their inception, who ultimately procured the tax deed and extinguished plaintiff's mortgage.[5] When Corvetti paid $182,916 in December 1996 to purchase the two tax sale certificates from TCA, he was merely removing a superior lien against the property which had existed from the day of the closing on the Carney mortgage. It was thereafter, namely, in June 1997, that Corvetti, admittedly on the advice of counsel, paid an additional $272,000 in past due taxes which had accumulated subsequent to 1994 and accepted a deed to the premises from the County. It was this latter business decision, itself legal and prudent, and not the earlier purchase of the tax sale certificates or any alleged malpractice of defendants, which led to the recordation of the tax deed and the extinguishment of plaintiff's mortgage. In other words, it was Corvetti himself, in violation of his fiduciary duty to plaintiff, who created the alleged "damages" suffered by his corporation.

We conclude, therefore, that to the extent that plaintiff was damaged, if at all, by the loss of the security interests designed to protect plaintiff's original investment of $300,000, such damages were caused by the actions of its fiduciary, rather than the alleged malpractice of defendants. Accordingly, defendants are

---

lation did not address the unforeseen situation that the tax liens for 1993 and 1994 had been sold at tax sales.

4. In his own words, Corvetti described the relationship between his business and personal finances as follows: "[W]e managed the cash flow between our personal assets and the company's [*sic*] in a fusion to maximize the return. Just like the bank will move money at night to another bank to earn interest and then get it back in the morning, we were moving the funds around between companies." When specifically asked whether the installment loan payments to plaintiff on the subject loan would ultimately pass to him, Corvetti responded that such payments were just a part of a "pool of money" divided among the entities controlled by him and allocated as business dictated.

Even if we had not found that Corvetti had the ability to finance plaintiff's acquisition of the property, plaintiff's alleged lack of funds would not alter the conclusion that Corvetti diverted a corporate opportunity by procuring the property for himself (*see Foley v D'Agostino*, 21 AD2d 60, 67-68 [1964]).

5. Additionally, prior to the sale of the property by Corvetti and his wife, Corvetti—on behalf of plaintiff, as its president—executed a mortgage release in favor of himself and his wife, personally.

entitled to summary judgment dismissing the complaint in its entirety.

Cardona, P.J., Peters, Carpinello and Kane, JJ., concur. Ordered that the order is reversed, on the law, without costs, defendants' motion for summary judgment and third-party defendant's motion to dismiss granted, complaint and third-party complaint dismissed, and appeals with respect to the remaining motions dismissed as academic.