RAPISTAN CORPORATION v MICHAELS

Docket Nos. 139788, 141390. Submitted October 5, 1993, at Grand
Rapids. Decided January 19, 1994, at 9:00 A.M.

Rapistan Corporation and its parent corporation, Lear Siegler
Holdings Corporation, brought an action for damages in the
Kent Circuit Court against former Rapistan corporate officers
William R. Michaels, Michael J. Tilton, and Stephen J. O'Neill
and Alvey Holdings, Inc., alleging that Michaels, Tilton, and
O'Neill usurped a business opportunity of Rapistan and Lear
Siegler Holdings in the form of the acquisition of Alvey, Inc.,
and that Alvey Holdings, Inc., which ultimately acquired Alvey,
Inc., and hired Michaels, Tilton, and O'Neill, aided and abetted
and conspired with Michaels, Tilton, and O'Neill in the breach
of fiduciary duties owed by those individuals to Rapistan.
Additionally, Rapistan and Lear Siegler Holdings sought rescis-
sion of a stock subscription agreement between Lear Siegler
Holdings and Michaels on the basis of Michaels' alleged breach
of fiduciary duties. Following a bench trial, the court, Robert A.
Benson, J., entered a judgment of no cause of action and
ordered Rapistan and Lear Siegler Holdings to pay the defen-
dants' costs. Rapistan and Lear Siegler Holdings appealed
separately. The appeals were consolidated.

The Court of Appeals *held:*

1. Under Delaware law applicable to this case, when a
business opportunity comes to a corporate officer in the officer's
individual rather than official capacity and the opportunity is
one that, because of the nature of the enterprise, is not essen-
tial to the corporation and is one in which the corporation has
no interest or expectancy, the officer is entitled to treat the
opportunity as the officer's own, and the corporation has no
interest in the opportunity, provided that the officer has not
wrongfully embarked the corporation's resources therein. In
this case, the trial court did not err in finding that the business
opportunity in dispute came to Michaels, Tilton, and O'Neill in
their individual capacities rather than in their official capaci-

REFERENCES

Am Jur 2d, Corporations § 1779.
See ALR Index under Corporate Opportunity.

ties; that the acquisition of Alvey, Inc., was not essential to Rapistan; that Michaels, Tilton, and O'Neill had not utilized significant Rapistan resources in the acquisition of Alvey, Inc.; and that Michaels, Tilton, and O'Neill therefore had not usurped a business opportunity from Rapistan and Lear Siegler Holdings.

2. Michaels, Tilton, and O'Neill were not estopped from denying that the acquisition of Alvey, Inc., was a business opportunity for Rapistan and Lear Siegler. The minimal application of Rapistan resources by those individuals to the development of the opportunity was insufficient to invoke the equitable remedy of estoppel.

3. Rapistan and Lear Siegler Holdings, in failing to establish any breach of fiduciary duties by Michaels, Tilton, and O'Neill, also failed to establish that Alvey Holdings conspired with those individuals in any breach of their fiduciary duties.

4. The trial court did not err in refusing to rescind the stock subscription agreement between Lear Siegler Holdings and Michaels. Under New York law applicable to this case, a corporate officer owes a statutory duty of good faith and diligence to the corporation and forfeits rights to compensation, including rights under stock subscription agreements, upon a breach of those duties. In this case, Rapistan and Lear Siegler Holdings failed to establish any breach of duty by Michaels that would warrant rescission of the stock subscription agreement.

Affirmed.

1. CORPORATIONS — OFFICERS AND DIRECTORS — USURPATION OF CORPORATE OPPORTUNITIES.

A corporate officer or director does not usurp a business opportunity of the corporation where the opportunity comes to the officer or director in the officer's or director's individual capacity rather than official capacity, the opportunity is not essential to the corporation, and the officer or director has not wrongfully embarked the corporation's resources in developing the opportunity.

2. CORPORATIONS — OFFICERS AND DIRECTORS — USURPATION OF CORPORATE OPPORTUNITIES.

A fiduciary of a corporation who uses corporate assets to develop a business opportunity may be estopped from denying that the resulting opportunity belongs to the corporation whose assets were misappropriated, even if it was not feasible for the corporation to pursue the opportunity or it had no expectancy in the project.

*Miller, Canfield, Paddock & Stone* (by *Robert D. VanderLaan* and *Gary E. Mitchell*), for Rapistan Corporation and Lear Siegler Holdings Corporation.

*Varnum, Riddering, Schmidt & Howlett* (by *Thomas J. Mulder, Stephen P. Afendoulis* and *N. Stevenson Jennette, III*), for William R. Michaels, Michael J. Tilton, and Stephen J. O'Neill.

*Gruel, Mills, Nims & Pylman* (by *Grant J. Gruel*), for Alvey Holdings, Inc.

Before: FITZGERALD, P.J., and REILLY and P. R. JOSLYN,* JJ.

PER CURIAM. These consolidated appeals involve a claim of usurpation of a corporate opportunity by the former management of plaintiff Rapistan Corporation. Plaintiffs Rapistan and Lear Siegler Holdings Corporation appeal as of right from a March 25, 1991, order and final judgment of no cause of action in favor of defendants William R. Michaels, Michael J. Tilton, Stephen J. O'Neill, and Alvey Holdings, Inc., and from a May 13, 1991, order and judgment requiring plaintiffs to pay costs in the amount of $35,300.05. We affirm.

I

In January 1987, Lear Siegler Holdings, a Delaware corporation, acquired Lear Siegler and its subsidiaries, which included Rapistan. Rapistan, also a Delaware corporation, is one of the nation's largest manufacturers and sellers of materials-handling conveyor equipment and systems. Rapistan's marketing focus is the warehouse-distribution market. At the time of the acquisition of

---

* Circuit judge, sitting on the Court of Appeals by assignment.

Rapistan by Lear Siegler Holdings, Michaels, Tilton, and O'Neill were part of the management team at Rapistan. Specifically, Michaels was the president and chief executive officer of Rapistan. He also became a shareholder in Lear Siegler Holdings. Tilton served as the vice president of finance for Rapistan. O'Neill served as the vice president of marketing and sales. Michaels, Tilton, and O'Neill resigned their positions at Rapistan on September 6, 1988. The following day, the three former Rapistan executives signed employment agreements with Alvey Holdings, Inc., a corporation created by Raebarn, Inc., a merchant bank that arranges leveraged buyouts on its own behalf and on behalf of other investors, for the purpose of acquiring Alvey, Inc., a manufacturer of both conveyors and pallitizers. A pallitizer is a machine that stacks a uniform package into layers on a pallet for further conveyance or distribution. Approximately two-thirds of Alvey's business is the manufacture and sale of conveyors. The remaining one-third of Alvey's business is the manufacture and sale of pallitizers. A pallitizer has no application in the warehouse-distribution sector of the conveyor market. Instead, a pallitizer is used in the industrial sector of the market, in such industries as food, beverage, and paper manufacturing. Raebarn and its investors acquired Alvey on August 26, 1988. At the time of trial, Michaels served as the president, chief executive officer, and chairman of the board of Alvey and Alvey Holdings. Tilton served as the chief financial officer of Alvey. O'Neill served as the senior vice president of sales and marketing at Alvey.

After learning of the involvement of the three former Rapistan executives with Raebarn and the acquisition of Alvey, the degree of which was contested at trial, Lear Siegler Holdings and Ra-

pistan filed a complaint against Michaels, Tilton, O'Neill and several other individuals, who are not parties to the instant appeals, in the circuit court, seeking monetary damages and injunctive, declaratory, and other equitable relief. The complaint contained allegations that the former Rapistan executives breached their fiduciary duties owed to Rapistan, misappropriated a Rapistan corporate opportunity, and misappropriated and misused confidential Rapistan information. Additionally, Lear Siegler Holdings and Rapistan sought to nullify a stock subscription agreement between Michaels and Lear Siegler Holdings, pursuant to which Michaels had acquired the opportunity to purchase 825 shares of Class B common stock in Lear Siegler Holdings. This complaint was subsequently amended to add Alvey Holdings as a defendant and to allege that Alvey Holdings aided and abetted and conspired with the former Rapistan executives in the breach of the fiduciary duties owed by the executives to Rapistan.

The trial court rejected the claims of Lear Siegler Holdings and Rapistan in an opinion delivered from the bench on February 20, 1991. Specifically, the court found that Michaels, Tilton, and O'Neill learned that Alvey was for sale in their capacities as individuals, not in their capacities as Rapistan managers, that the acquisition of Alvey was not essential to Rapistan, that there was no credible evidence that Rapistan had an expectation in Alvey, that Michaels, Tilton, and O'Neill had not embarked sufficient Rapistan corporate assets on the Alvey venture to require the intervention of equity to estop the executives from denying that Alvey was a Rapistan corporate opportunity, and that Lear Siegler Holdings and Rapistan had no cause of action against defendants. The court also found that Michaels, Tilton, and O'Neill were

entitled to costs from Lear Siegler Holdings and Rapistan. These appeals followed.

II

We conclude that the trial court correctly chose to apply the *Guth* Corollary, as originally formulated in *Guth v Loft, Inc,* 23 Del Ch 255; 5 A2d 503 (1939), and not the corollary as restated in *Equity Corp v Milton,* 43 Del Ch 160; 221 A2d 494 (1966). We also conclude that the trial court correctly applied the law to the facts as presented and correctly determined that Michaels, Tilton, and O'Neill did not divert a corporate opportunity belonging to Lear Siegler Holdings and Rapistan to their personal use.

We review questions of law de novo. *Cardinal Mooney High School v Michigan High School Athletic Ass'n,* 437 Mich 75, 80; 467 NW2d 21 (1991). The parties agree that the resolution of the questions before us with regard to application of the corporate opportunity doctrine is controlled by Delaware law.

The seminal Delaware case regarding the doctrine of corporate opportunity is *Guth, supra.* The general principles of the corporate opportunity doctrine announced in *Guth* have since been referred to as the *Guth* Rule and the *Guth* Corollary. The *Guth* Rule provides:

> [I]f there is presented to a corporate officer or a director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation,

the law will not permit him to seize the opportunity for himself. [23 Del Ch 272-273.]

On the other hand, the *Guth* Corollary provides:

It is true that when a business opportunity comes to a corporate officer or director in his individual capacity rather than in his official capacity, and the opportunity is one which, because of the nature of the enterprise, is not essential to his corporation, and is one in which it has no interest or expectancy, the officer or director is entitled to treat the opportunity as his own, and the corporation has no interest in it if, of course, the officer or director has not wrongfully embarked the corporation's resources therein. [23 Del Ch 271.]

See also *Johnston v Greene,* 35 Del Ch 479, 485-486; 121 A2d 919 (1956).

In the present case, the trial court, relying on *Guth,* concluded that the test for determining whether the nature of the opportunity presented by Alvey was corporate depended on whether the opportunity was first presented to Michaels, Tilton, and O'Neill in their capacities as individuals or as corporate representatives. Accordingly, the court began its analysis by examining the record evidence to determine whether the opportunity was presented to Michaels, Tilton, and O'Neill, individually. Plaintiffs argue that the trial court erred as a matter of law when it looked to the capacities of the former Rapistan executives rather than to the nature of the opportunity presented. We disagree.

Plaintiffs base their argument on the Delaware Supreme Court's restatement of the *Guth* Corollary in *Equity Corp v Milton,* 43 Del Ch 160; 221 A2d 494 (1966). The court in *Equity Corp* paraphrased the *Guth* Corollary as follows:

> A corollary of the *Guth* rule is that when a business opportunity comes to a corporate officer, which, because of the nature of the opportunity, is not one which is essential or desirable for his corporation to embrace, being an opportunity in which it has no actual or expectant interest, the officer is entitled to treat the business opportunity as his own and the corporation has no interest in it, provided the officer has not wrongfully embarked the corporation's resources in order to acquire the business opportunity. [43 Del Ch 164.]

A comparison of the language employed in the original expression of the corollary with the language employed in the *Equity Corp* court's paraphrasing of the corollary reveals that the *Equity Corp* court omitted the phrase "in his individual capacity rather than in his official capacity," from the original text of the corollary. Compare *Guth, supra* at 271, with *Equity Corp, supra* at 164. Plaintiffs rely on the absence of language concerning individual capacity to support their assertions that the Delaware Supreme Court has rethought and rejected the requirement that a court must determine whether the business opportunity came to the corporate officer in the officer's individual or corporate representative capacity and that the trial court in the present case erred as a matter of law when it concluded that the capacity in which the corporate officer first became aware of the opportunity determines whether the *Guth* Rule or the *Guth* Corollary applies.

We reject the argument that *Equity Corp* announced the abandonment of the individual capacity versus corporate representative capacity distinction of the *Guth* Corollary, as originally expressed by the *Guth* court, for the following reasons. First, the *Equity Corp* court never expressly repudiated the capacity distinction found in the

original formulation of the *Guth* Corollary. To the contrary, the court expressly observed that the law with regard to corporate opportunity was settled in Delaware by *Guth, supra,* and *Greene, supra. Equity Corp, supra* at 164. Second, the *Equity Corp* court resolved the issues before it by application of the *Guth* Rule, not the *Guth* Corollary. Accordingly, the *Equity Corp* court's restatement of the *Guth* Corollary constitutes nonbinding dictum. Third, and most important, the Delaware Supreme Court, some five years after its decision in *Equity Corp,* revisited the corporate opportunity doctrine and applied the *Guth* Corollary as originally expressed in *Guth,* specifically relying on the individual versus corporate representative capacity distinction. *Kaplan v Fenton,* 278 A2d 834, 836 (Del, 1971).

Given the continued vitality of the *Guth* Corollary as originally expressed in *Guth, supra* at 271, after *Equity Corp,* as demonstrated by *Kaplan, supra* at 836, we reach the following conclusions with regard to the corporate opportunity doctrine. First, a court, when determining whether a business opportunity is a corporate opportunity, must ascertain whether the opportunity was presented to a corporate officer in the officer's individual or representative capacity. Second, after determining the manner in which the opportunity was presented, the court must determine the nature of the opportunity. Third, the nature of the opportunity is analyzed differently, depending on whether the opportunity is presented to a corporate official in the official's individual or corporate representative capacity. *Guth, supra* at 271-280. Accordingly, we cannot say that the trial court committed legal error when it concluded that Delaware law required it to consider the capacity of the corporate officer at the time of the presentation of the oppor-

tunity as a factor in determining whether a corporate opportunity existed and when it concluded that Delaware law required it to view the nature of the opportunity in light of the capacity of the corporate officer when the opportunity was received.

We also cannot say that the trial court erred as a matter of law in its application of the law to the facts as presented at trial. We reject plaintiffs' assertion that the trial court erred as a matter of law when it failed to consider whether the acquisition of Alvey was desirable to Rapistan and when the court failed to recognize that its factual findings established the desirability of Alvey's acquisition by Rapistan. The *Guth* Corollary contains no requirement that the trial court examine the desirability of the opportunity. *Guth, supra* at 271.

We also reject the assertion that the trial court erred as a matter of law when it found that the opportunity to acquire Alvey was not "essential" to Rapistan. After reviewing the record evidence and the trial court's findings, we conclude that, although plaintiffs are correct in their belief that the business of Alvey was related to the business of Rapistan, the acquisition of Alvey was not so indispensably necessary to the conduct of the business of Rapistan that the deprivation of the acquisition threatened the viability of Rapistan. *Johnston, supra* at 485-486; *Alexander & Alexander of New York, Inc v Fritzen,* 147 AD2d 241, 248; 542 NYS2d 530 (1989); Black's Law Dictionary (5th ed), p 490.

We further reject the assertion that the trial court erred as a matter of law when it failed to recognize that its factual findings demonstrated that Rapistan had an expectation or interest in the acquisition of Alvey. We cannot conclude, after reviewing the trial court's findings, that those

findings establish that Rapistan had any urgent or
practical need to acquire Alvey, *Guth, supra* at
279, or that the acquisition of Alvey fit into an
established corporate policy or into the particular
business focus of Rapistan, *Equity Corp, supra* at
164. See also *Alexander, supra* at 247-248.

We reject plaintiffs' assertion that the trial court
substituted its judgment with regard to how im-
portant the Alvey acquisition would have been to
Rapistan, thereby effectively adopting the claim of
Michaels, Tilton, and O'Neill that Rapistan would
not have been interested in the opportunity to
acquire Alvey had they brought the opportunity to
the attention of Rapistan and Lear Siegler Hold-
ings. While it may be true that the best method
for determining whether an opportunity is a corpo-
rate opportunity is to allow the corporation to
decide at the time the opportunity is fully dis-
closed, see 3 Fletcher, Cyclopedia Corporations,
§ 861.1, p 288, it does not follow from this truth
that all a corporation claiming that an opportu-
nity was usurped need do to establish the claim is
assert that, had an opportunity been disclosed, it
would have seized the opportunity. Where a claim
is raised that a corporate opportunity has been
usurped, the claim is one for the trial court to
resolve by reasonable inferences drawn from objec-
tive facts. *Johnston, supra* at 485-486; *Guth, supra*
at 277. In the present case, the trial court exam-
ined the law of corporate opportunity, made find-
ings of fact, applied the law to the facts as found,
and reached a conclusion with regard to whether a
corporate opportunity existed. It was required to
do no less. Our review of the trial court's opinion
does not support plaintiffs' characterization of the
court's decision.

Lastly, we reject the assertion that the trial
court erred in relying on the decision of the Mary-

land Court of Appeals in *Maryland Metals, Inc v Metzner,* 282 Md 31; 382 A2d 564 (1978). Plaintiffs' assertion is premised on two conclusions reached by plaintiffs: first, that *Maryland Metals* is factually inapposite because the case was a preparation-to-compete case where no usurpation of a corporate opportunity existed, whereas the present case is not a preparation-to-compete case and a usurpation of a corporate opportunity did occur; and second, that the trial court employed *Maryland Metals* to defeat plaintiffs' claim of usurpation of a corporate opportunity. Plaintiffs' conclusions are ill-founded for two reasons. First, our review of the trial court's opinion indicates that the court applied Delaware law concerning the doctrine of corporate opportunity to determine whether Michaels, Tilton, and O'Neill had usurped a corporate opportunity. The court did not rely on *Maryland Metals* to the exclusion of applicable Delaware law. Second, the corporate opportunity doctrine is frequently intertwined, sometimes inextricably, with the legal concept of fiduciary duty, see e.g., *Guth, supra* at 280; *Science Accessories Corp v Summagraphics Corp,* 425 A2d 957, 962-964 (Del, 1980). In fact, plaintiffs' own complaint demonstrates this point. The complaint alleges both a misappropriation of a corporate opportunity and a breach of fiduciary duty premised on alleged activities undertaken by Michaels, Tilton, and O'Neill while employed by Rapistan. Accordingly, plaintiffs placed before the trial court not only the question whether a corporate opportunity existed, but also whether the former Rapistan corporate officers engaged in conduct that violated fiduciary duties owed Rapistan during their employment with Rapistan. Further, from the beginning, Michaels, Tilton, and O'Neill denied that they breached their fiduciary duties in any manner and

characterized their actions as actions taken in preparation and furtherance of an employment opportunity. Given this factual background and given that *Maryland Metals* contains a well-developed discussion of the extent to which a corporate officer, before the termination of an employment relationship, may make preparations to compete with the corporate employer without violating fiduciary duties owed to the corporation, we conclude that the trial court properly sought guidance from *Maryland Metals.*

III

We conclude that the trial court did not err as a matter of law when it failed to find that the use of Rapistan corporate resources by Michaels, Tilton, and O'Neill to further the Alvey opportunity estopped the trio from denying that the acquisition of Alvey was a Rapistan corporate opportunity. The record evidence fails to establish a sufficient application of corporate assets to merit intervention as a matter of equity.

Even though a business opportunity may not constitute a corporate opportunity under the conventional tests employed in determining whether a corporate opportunity exists, a corporate representative will be estopped nevertheless from denying that the business opportunity was a corporate opportunity if the representative wrongfully embarked the corporation's assets in the development or acquisition of the business opportunity. *Guth, supra* at 271. *Equity Corp, supra* at 164; 3 Fletcher, Cyclopedia Corporations, § 861.1, p 287. "This is because the fiduciary is seen as having previously asserted to the corporation that the opportunity was worth pursuing, and as an equitable matter the fiduciary will not be allowed to

deny the truth of his prior assertion." *Id.* The rationale behind this equitable rule was explained in greater detail in *Graham v Mimms,* 111 Ill App 3d 751, 763-764; 67 Ill Dec 313; 444 NE2d 549 (1982), as follows:

> Nevertheless, the "core principle" of the corporate opportunity doctrine is that a corporation's fiduciary will not be permitted to usurp a business opportunity which was developed through the use of corporate assets. (Brundney and Clark, 94 Harv L Rev 997, 1006 [1981].) "The principle rests on the same considerations that forbid appropriations of the assets themselves, but adds the remedy of tracing the misappropriated assets into their product—a conventional remedy in the law of trusts." (94 Harv L Rev 997, 1007.) Therefore, when a corporation's fiduciary uses corporate assets to develop a business opportunity, the fiduciary is estopped from denying that the resulting opportunity belongs to the corporation whose assets were misappropriated, even if it was not feasible for the corporation to pursue the opportunity or it had no expectancy in the project.
>
> As the court explained in *In Re Trim-Lean Meat Products, Inc* (D Del 1980) 4 Bankr L Rep 243, 247:
>
> "[T]he proscription against appropriation of corporate property for private gain is of broader application than the corporate opportunity rule. The latter is but a specialized application of the former. It essentially treats a corporation's expectations regarding certain business opportunities which are in the corporation's line of business and of practical advantage to it as corporate property which may not be appropriated for personal gain. On the other hand, the general proscription against misapplication of corporate funds applies equally to business opportunities outside the corporation's line of business. Thus, a business opportunity falling outside a corporation's line of business and which would not otherwise be considered a corporate opportunity, nevertheless will be deemed

a *corporate opportunity* if developed or financed with corporate funds."

The purpose of the equitable estoppel doctrine is to prevent fraud and injustice (*Dill v Widman* [413 Ill 448, 456; 109 NE2d 765, 769 (1952)]) by precluding a litigant from denying the truth of prior assertions (*Mills v Graves* [38 Ill 456, 464 (1865)]), on which another litigant has relied. (*Dill v Widman* [413 Ill 448, 455-56; 109 NE2d 765, 769 (1952)].)

A fiduciary's compensated time is regarded as a corporate asset; accordingly, the rule of estoppel applies to a person who uses "company" time to develop a business opportunity. Likewise, use of the compensated time of other corporate employees triggers an application of the estoppel doctrine. *Graham, supra* at 764; Fletcher, § 861.1, p 287; see also *Phoenix Airline Serv v Metro Airlines,* 194 Ga App 120, 124; 390 SE2d 219 (1990), rev'd on other grounds 260 Ga 584; 397 SE2d 699 (1990). Corporate assets also include cash, facilities, contracts, goodwill, and corporate information. Brudney & Clark, *A New Look at Corporate Opportunities,* 94 Harv L Rev 997, 1006-1007 (1981).

Generally speaking, estoppel is applied more consistently when "hard" assets, such as cash, facilities, and contracts, are used rather than when "soft" assets, such as good will, working time, and corporate information, are used. *Id.* at 1007. The use of hard assets is often dispositive of the usurpation-of-opportunity issue. *Id.* at 1007-1008. However, "the concept 'corporate asset' and its relationship to the opportunity being diverted become less clear when what is involved is the time of an executive or information about a new project discovered by an officer during, but not strictly within, the course of his employment." *Id.* at 1008-1009.

Our review of the record evidence leads us to the conclusion that Rapistan funds, facilities, personnel, and compensated time, in minimal amounts, were used by Michaels, Tilton, and O'Neill to further Raebarn's attempt to acquire Alvey once the opportunity was presented to Raebarn. However, we observe that the estoppel doctrine is based on equity. Fletcher, § 861.1, p 287. Further, the doctrine "operates somewhat unpredictably in practice" when the concept of corporate asset and its relationship to the opportunity being diverted become less clear. Brudney & Clark, *supra* at 1008-1009. Generally, it appears that estoppel applies where there has been a significant use of corporate assets by a fiduciary and where there is a direct and substantial nexus or causal connection between the assets embarked and the creation, pursuit, and acquisition of the business opportunity. See, e.g., *Graham, supra* at 763-764; *Goodhue Farmers' Warehouse Co v Davis,* 81 Minn 210; 83 NW 531 (1900). Cf. *Guth, supra.* In the present case, the amount of assets embarked were minimal, especially in light of the $29.5 million cost of acquiring Alvey. Moreover, we find that the record evidence fails to demonstrate a direct and substantial nexus or causal connection between use of Rapistan assets and the creation, development, and acquisition of the Alvey opportunity. Lastly, the record evidence fails to establish that confidential or proprietary information was used by the former Rapistan executives. See, e.g., *MBL (USA) Corp v Diekman,* 112 Ill App 3d 229, 236; 67 Ill Dec 938; 445 NE2d 418 (1983). Under such circumstances, we conclude that the present case is not the type of case in which the estoppel doctrine was meant to apply and that equity would not be well served by an application of the estoppel doctrine. Accordingly, we do not find that the trial court

erred in its balancing of the equities or in its refusal to apply the estoppel doctrine in this case.

IV

We conclude that the trial court properly rejected plaintiffs' conspiracy claim. Under Delaware law, a conspirator is jointly and severally liable for the acts of coconspirators committed in furtherance of the conspiracy. *Nicolet, Inc v Nutt,* 525 A2d 146, 150 (Del, 1987). Accordingly, a third party who knowingly participates in a breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship. *Gilbert v El Paso Co,* 490 A2d 1050, 1057 (Del Ch, 1984), aff'd 575 A2d 1131 (Del, 1990). A corporation can be a conspirator if the corporation's participation in the conspiracy is shown. 10 Fletcher, Cyclopedia Corporations, § 4884, pp 369-370. In the present case, plaintiffs have failed to establish that the former Rapistan executives usurped a Rapistan corporate opportunity. Accordingly, plaintiffs also have failed to establish their conspiracy claim. There can be no conspiracy where there is no underlying wrong.

V

Finally, we decline to order the recision of the stock subscription agreement entered into between plaintiff Lear Siegler Holdings and defendant Michaels. The parties agree that resolution of the issue before us is controlled by the law of the State of New York.

Under New York law, a corporate officer owes a statutory duty of good faith and diligence to the corporation. The officer also owes a common-law duty of good faith and loyalty. *Maritime Fish Products, Inc v World Wide Fish Products, Inc,* 100

AD2d 81, 87-88; 474 NYS2d 281 (1984). An employee who breaches these duties forfeits rights to compensation for services performed during the period of the employee's disloyalty. *Westwood Chemical Co, Inc v Kulick,* 570 F Supp 1032, 1041 (SD NY, 1983). If an employee's compensation is allocated to periods of time or to the completion of specific items of work, then forfeiture is apportioned according to the specific periods of time or to the task completed. *Musico v Champion Credit Corp,* 764 F2d 102, 112-114 (CA 2, 1985).

Plaintiffs provide no citation to any legal authority that holds that stock purchased pursuant to a stock subscription agreement constitutes compensation for purposes of the New York forfeiture rule. However, we conclude that stock purchased pursuant to a stock subscription agreement does constitute compensation subject to the forfeiture doctrine, given that a board of directors cannot make a gift of corporate funds to a corporate officer, given that a board of directors has no authority to apply corporate assets to a corporate officer for services already rendered, and given that the option to purchase stock in a corporation is generally given a corporate officer as incentive compensation. See, e.g., *Wyles v Campbell,* 77 F Supp 343, 346 (D Del, 1948); cf. *Shipman v General Transistor Corp,* 22 Misc 2d 632, 634; 198 NYS2d 852 (1960), aff'd 12 AD2d 529; 207 NYS2d 734 (1960).

We have reviewed the record evidence and find that Michaels breached no duty owed Rapistan between the effective date of the subscription agreement and the date of the vesting of one-third of the stock subject to acquisition under the agreement. Further, given that the stock option constituted incentive compensation and that Rapistan received an award from Lear Siegler Holdings at

the April 1988 meeting of the presidents of all Lear Siegler Holdings subsidiaries for being the best-managed subsidiary, we find that Michaels earned the one-third vested stock, that Rapistan was not hurt by any conduct of Michaels that occurred during the one-year period, and that forfeiture would be inconsistent with the purpose of the subscription agreement. Accordingly, we cannot say that the trial court erred as a matter of law when it rejected plaintiffs' request for recision.

Affirmed.