# STATE OF MICHIGAN

# COURT OF APPEALS

---

JOHN J. MATOUK,

        Plaintiff-Appellee,

v

THE ROBERT L. BARRICK TRUST and
ROBERT L. BARRICK,

        Defendants,

and

TIMOTHY MATOUK,

        Appellant.

UNPUBLISHED
May 2, 2017


No. 328983
Oakland Circuit Court
LC No. 2014-143447-CK

---

JOHN J. MATOUK and MATOUK
INVESTMENTS OF NOVI, LLC,

        Plaintiffs-Appellants,

v

ROBERT L. BARRICK, THE ROBERT L.
BARRICK TRUST, and BARRICK
PROPERTIES #40, LLC,

        Defendants-Appellees.

No. 331987
Oakland Circuit Court
LC No. 2014-143447-CB

---

Before: MARKEY, P.J., and WILDER and SWARTZLE, JJ.

PER CURIAM.

These consolidated appeals arise out of distinct orders entered below by different circuit court judges. The change in judges resulted from a midstream transfer of the action below to business court. In Docket No. 328983, nonparty-appellant, Timothy Matouk (Timothy),claims an appeal as of right from the trial court's order granting the motion of plaintiff, John J. Matouk

-1-

(John), to compel Timothy to attend a deposition and answer certain questions.[1]  Because he neither was nor will be deposed, we conclude that Timothy's claim of appeal is moot.

In Docket No. 331987, in which John and Matouk Investments of Novi, LLC (Matouk Investments) (collectively, plaintiffs), appeal as of right the trial court's order granting defendants Robert L. Barrick, the Robert L. Barrick Trust (the Trust), and Barrick Properties #40, LLC (Barrick Properties) (collectively, defendants) summary disposition of all of plaintiffs' claims, we affirm.

## I.  FACTUAL BACKGROUND

This case arises out of plaintiff John's insolvency during the "Great Recession," resulting in numerous judgments against him. John subsequently attempted to shield his assets from creditors by temporarily transferring title to those assets to Barrick, such attempt being described euphemistically by the parties as the "parking" of John's assets with Barrick.

By affidavit, John testified as follows:

1.     I am a real estate investor who fell into financial hardship when the real estate market imploded.

2.     Facing foreclosure on my personal residence as well as other outstanding debt obligations that were coming or had come due, I sought the help of a trusted friend: Robert L. Barrick.

3.     Between 2008 and 2012, I entered into a series of loan transactions with Robert L. Barrick or various financial entities under his control ("Barrick") in which Barrick made certain loans and advances to me (both secured and unsecured) in exchange for an oral promise that I would repay him for the value of those loans when my personal finances improved.

* * *

5.     Consistent with our loan arrangements, I transferred the title to certain real and personal properties to Barrick.  These transfers were not sales or purchases, but rather were intended to serve as collateral for the loan obligations I had incurred, in the event that I was unable to repay Barrick.

6.     For example, in March 2009, Barrick took title to real property situated at 43420 Grand River Ave., Novi, MI, where Fidelity Investments was the major tenant (the "Fidelity Property").

---

[1] John argues that this Court lacks appellate jurisdiction over Timothy's claim of appeal.

7. At the time the Fidelity Property was provided to Barrick, it had been sold at sheriff's auction by Huntington Bank for $1,519,937.91.

* * *

10. Barrick and I agreed that the Fidelity Property would serve as additional collateral for loans that Barrick had previously provided to me, because the existing collateral provided to that point had been insufficient.

11. Barrick did not repay me or any business entity under my control any money for the Fidelity Property, nor did he loan me any additional money at the time that the deal closed.

* * *

15. Barrick received $1,577,132 in payments on the [Fidelity] property.

* * *

24. In early 2012, Barrick and I agreed that I could redeem the Fidelity Property and fully repay Barrick for all outstanding loan obligations that I owed to Barrick, by paying $2.95 million. We also decided that the amount of credit given for rents paid on the Fidelity Property would be addressed later.

* * *

26. Barrick fraudulently induced me into believing that I could reacquire the Fidelity Property once I repair [sic] certain outstanding loan obligations.

27. A third party purchaser acquired the Fidelity Property from Barrick Properties. . . .

As referenced in John's affidavit testimony, the "parking" arrangement between John and Barrick involved numerous assets and was memorialized by several written agreements. In October 2008, Barrick, acting as trustee of his Trust, entered into the "Global Agreement" (the global agreement) with John. The "**RECITALS**" section of the global agreement provided, in pertinent part, "It is agreed by the parties that the above mentioned recitals are not mere declarations, but rather part of the terms and conditions of this Agreement." The global agreement had neither a merger clause nor an integration clause. Attached to the global agreement as exhibits were seven other contractual agreements between the parties. Such contracts granted Barrick (as trustee of his trust) a variety of interests in John's real and personal property. The contracts in question demonstrate a sophisticated understanding of contract law and secured transactions and include outright purchase agreements, a lease, an assignment of a lease, several options to purchase real estate, a pledge of security consisting of membership interests in a limited liability company (LLC), and a security agreement.

Matouk Investments later assigned the right to redeem the Fidelity property to Barrick Properties. Matouk Investments also provided a warranty deed conveying the Fidelity property to Barrick Properties, which was duly recorded.

In July 2009, the parties entered a "First Amendment to Global Agreement" (the first amendment). The "**RECITALS**" section of the first amendment provides,

A. On October 17, 2008, the Parties entered into a Global Agreement ("Agreement") setting forth the terms and conditions of certain financing extended by Barrick to [John] as well as the sale and transfer of certain personal and real property from [John] to Barrick.

B. Since entering the Agreement . . . Barrick has made additional loans, both secured and non-secured, to [John] and/or entered into transactions for the benefit of [John], which can be summarized as follows:

(i) $1,732,500 - Fidelity Investments of Novi building

(ii) $ 25,000 - Advanced secured [sic] by Mercedes CL55

(iii) $10,000 - Advance secured by IWC Watch

(iv) $ 90,000 - Advance secured by Ferrari 360 Spider

(v) $105,000 - Advance

C. On July 23, 2009, Barrick has advanced the sum of $75,000 to [John].

D. The Parties agree that [John] is indebted to Barrick in the amount $3,300,000.

In pertinent part, the remainder of the first amendment provides,

1. On or before August 15, 2009, [John] shall pay the sum of $3,000,000 to Barrick.

2. Upon receipt of the payment called for in paragraph 1 above, Barrick shall transfer the Fidelity Investments of Novi Building to [John] or an entity to be formed by [John].

* * *

7. Except as otherwise provided herein, all other terms and condition [sic] of the original Global Agreement, and any subsequent financing related agreement between the Parties, shall remain in full force and effect.

John failed to make the $3 million payment to Barrick described in ¶ 1 of the first amendment.

On April 25, 2012, Barrick Properties and NOVI/GR LLC (NOVI/GR)—an entity John had formed to reacquire the Fidelity property—entered into a purchase agreement under which NOVI/GR agreed to pay $2.95 million, "plus or minus net pro-rations and adjustments as provided" in the purchase agreement, for the Fidelity property. The parties to the April 25, 2012 purchase agreement agreed that Barrick Properties was then "the owner of fee simple title to" the Fidelity property. On appeal, plaintiffs concede that NOVI/GR failed to pay the agreed $2.95 million. Defendants subsequently sold the Fidelity property to a third-party purchaser.

In reaction, John filed a verified complaint against Barrick and his Trust, asserting, among others, the following claims: (1) breach of contract, (2) fraudulent misrepresentation, (3) innocent misrepresentation, (4) breach of fiduciary duty, (5) unjust enrichment, (6) common-law conversion, (7) statutory conversion, (8) accounting, and (9) negligence.[2] At defendant's motion, the trial court subsequently granted Barrick and his Trust partial summary disposition of several claims other than those at issue in this appeal.

The matter proceeded to discovery. Timothy was listed as a potential witness in both John's witness list and that filed by defendants Barrick and the Trust. In July 2015, John filed a motion to compel Timothy's compliance with a subpoena to testify at a deposition. John alleged that Timothy had ignored a previous subpoena to appear for a deposition and had, through counsel, indicated that he was only willing to be deposed if the "scope" of the inquiry excluded certain questions. After entertaining oral argument on the matter, the trial court granted John's motion to compel, thereby ordering Timothy to appear for his deposition and to answer the disputed questions. Timothy filed a claim of appeal from the trial court's order compelling his deposition testimony, thereby instituting Docket No. 328983.[3]

Once the action was transferred to business court, defendants moved for summary disposition of all of plaintiffs' claims under MCR 2.116(C)(10). Defendants argued, *inter alia*, (1) that plaintiffs could not pursue a breach of contract claim against defendants regarding the Fidelity property because plaintiffs breached the first amendment, failing to pay defendants $3.3 million within the agreed timeframe, (2) that the first amendment and subsequent purchase agreements superseded any prior oral agreement between the parties regarding the alleged "parking" arrangement, (3) that all of plaintiffs' equitable claims were barred by the doctrine of unclean hands, (4) that plaintiffs' innocent and intentional misrepresentation claims failed because the misrepresentations of which plaintiffs complained were about *future* conduct, not of a past or then-existing fact, (5) that even if such purported misrepresentations were considered under a fraudulent inducement theory, plaintiffs' claim would still fail because plaintiffs had

---

[2] John later sought and was granted leave to amend his verified complaint. Among other things, plaintiffs' first amended complaint added plaintiff Matouk Investments and defendant Barrick Properties, prompting the trial court to transfer this action to business court.

[3] John subsequently filed a motion in this Court to dismiss Timothy's claim of appeal for lack of appellate jurisdiction, which this Court denied without prejudice pending "further review by the case call panel." *John J Matouk v The Robert Barrick Trust*, unpublished order of the Court of Appeals, entered November 4, 2015 (Docket No. 328893).

-5-

adduced no evidence that Barrick did not actually intend to allow plaintiff to reacquire the Fidelity property when he allegedly promised to do so, (6) that plaintiffs' negligence claim was fatally flawed because plaintiffs had cited no legal duty owed them by defendants, (7) that plaintiffs could not pursue an unjust enrichment claim regarding the Fidelity property because express contracts between the parties existed regarding that property, and (8) that plaintiffs' conversion claims should be dismissed because "[t]he failure to make a credit against an alleged loan balance is not conversion" and also because such claims were barred by the applicable three-year statute of limitations.

In response, plaintiffs argued, in relevant part, (1) that plaintiffs did not breach the first amendment because it did not *require* plaintiffs to repurchase the Fidelity property, instead merely granting them an option to do so, (2) that the first amendment and subsequent purchase agreements did not supersede the parties' agreement regarding the "parking" arrangement, (3) that defendants had failed to present any evidence that plaintiffs' hands were unclean and that, in any event, defendants could not defend on the basis of unclean hands because their hands were equally dirty, (4) that plaintiffs had stated actionable claims for both fraudulent and innocent misrepresentation, (5) that the first amendment demonstrated that Barrick owed John a fiduciary duty because the parties had engaged in transactions "for the benefit of" John, (6) that a genuine issue of material fact remained whether defendants converted plaintiffs' property by retaining the rent proceeds from the Fidelity property without crediting those proceeds against John's "loan obligations" to defendants, and (7) that plaintiffs' negligence claim could proceed on the basis that Barrick owed plaintiffs a fiduciary duty.

After considering the matter, the trial court granted defendants summary disposition of all of plaintiffs' remaining claims. Notably, with regard to plaintiffs' breach of contract claim, the trial court decided that the "**RECITALS**" section of the first amendment, upon which plaintiffs' breach of contract claim was largely premised, was not part of the parties' agreement:

> [T]he Recitals of the First Amendment were not identified as part of the terms and conditions of the Agreement – unlike the Global Agreement, which provided that "the above mentioned recitals are not mere declarations, but rather part of the terms and conditions of this Agreement." It follows, therefore, that **the Recitals** of the First Amendment are not a part of the terms of the parties' contract.

Plaintiffs filed this claim of appeal from the trial court's summary disposition ruling, thereby instituting Docket No. 331987.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision regarding a motion for summary disposition. *Heaton v Benton Constr Co*, 286 Mich App 528, 531; 780 NW2d 618 (2009).

> A motion under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant

documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. [*Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013) (quotations marks and citations omitted).]

"This Court is liberal in finding genuine issues of material fact." *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008).

## III. ANALYSIS

### A. DOCKET NO. 331987

In Docket No. 331987, plaintiffs argue that the trial court erred by granting defendants summary disposition of all of plaintiffs' claims under MCR 2.116(C)(10). We disagree.

### 1. BREACH OF CONTRACT

"[I]n regard to breach of contract, a party claiming a breach must establish (1) that there was a contract, (2) that the other party breached the contract, and (3) that the party asserting breach of contract suffered damages as a result of the breach." *Doe v Henry Ford Health Sys*, 308 Mich App 592, 601; 865 NW2d 915 (2014).

When interpreting a contract, the examining court must ascertain the intent of the parties by evaluating the language of the contract in accordance with its plain and ordinary meaning. If the language of the contract is clear and unambiguous, it must be enforced as written. A contract is unambiguous, even if inartfully worded or clumsily arranged, when it fairly admits of but one interpretation. Every word, phrase, and clause in a contract must be given effect, and contract interpretation that would render any part of the contract surplusage or nugatory must be avoided. [*McCoig Materials, LLC v Galui Const, Inc*, 295 Mich App 684, 694; 818 NW2d 410 (2012) (citations omitted).]

"[S]eparate agreements are treated separately. However, when parties enter into multiple agreements relating to the same subject-matter, we must read those agreements together to determine the parties' intentions." *Wyandotte Electric Supply Co v Electrical Technology Sys, Inc*, 499 Mich 127, 148; 881 NW2d 95 (2016).

Plaintiffs' argument on appeal is that the parties' agreement was ambiguous and, thus, that their intent must be determined by a jury at trial, with the parties permitted to introduce extrinsic evidence regarding their intent. Plaintiffs' argument in this regard is dependent on language found in the first amendment's "**RECITALS**" section. Plaintiffs have cited no contractual language *other* than those recitals in support of their argument that the parties' written agreement was ambiguous about whether the Fidelity transaction constituted an outright sale or a collateralized loan. Because we conclude that the trial court properly determined that such recitals were not part of the terms and conditions of the parties' agreement, plaintiffs' instant claim of error must fail.

The global agreement's "**RECITALS**" section specifically provided that its recitals were "not mere declarations, but rather part of the terms and conditions of" the global agreement. On the other hand, the first amendment to the global agreement did *not* include such language. A construction of the parties' agreement nevertheless treating the recitals in the first amendment as "part of the terms and conditions of" the parties' agreement would render the "not mere declarations" language in the global agreement nugatory. In other words, if the parties intended the recitals in all of their written agreements to be part of their contract, they would not have included explicit language to that effect in *only* the global agreement while excluding such language from subsequent agreements. Ergo, the trial court correctly held that the recitals in the first amendment cannot be construed as part of the parties' agreement.

Furthermore, even if we consider the recitals in the first amendment as part of the parties' agreement, as plaintiffs urge us to do, we nevertheless discern no ambiguity whether the first amendment was in the form of a collateralized loan agreement or was an agreement regarding an outright sale. The recitals to the first amendment provided that Barrick had, since entering into the global agreement, "made additional loans, both secured and non-secured, to [John] *and/or* entered into transactions for the benefit of" John, including the redemption of the Fidelity property. (Emphasis added.) Although splicing the conjunctive "and" and the disjunctive "or" into "and/or" may not be the optimal way to list alternatives, in context the meaning is readily apparent here. The plain meaning expressed is that Barrick had "made additional loans, both secured and non-secured," to John, or "entered into transactions for" John's benefit, or done both. Hence, contrary to plaintiffs' argument on appeal, the recital language does not actually suggest that the Fidelity transaction was in the form of a loan, only that it was either a loan *or* a transaction for John's benefit.

And it is indisputable that the first amendment's provisions regarding the Fidelity transaction are in the form of an agreement about a contemplated conveyance, not a secured loan or an option agreement. As the series of contractual agreements appended to the global agreement demonstrates, the parties knew how to create an option to purchase real estate and how to grant a security interest in collateral when they wished to do so. The pertinent provisions of the first amendment, however, merely state, "[o]n or before August 15, 2009, [John] *shall* pay the sum of $3,000,000 to Barrick" and that "[u]pon receipt of" said payment, "Barrick *shall* transfer" the Fidelity property to John. (Emphases added.) "The word 'shall' is generally used to designate a mandatory provision," *Old Kent Bank v Kal Kustom, Enterprises*, 255 Mich App 524, 532; 660 NW2d 384 (2003), and no contrary intent is apparent under the terms of the agreement. Had the parties wished to provide John an "option" to reacquire the Fidelity property, as plaintiffs argue, they would have used the phrase "*may* pay the sum of $3,000,000 to Barrick," not "*shall* pay the sum." Moreover, with regard to the Fidelity transaction, the agreement does not include the terms "loan," "collateral," "security," or any other words to that effect. For those reasons, we reject plaintiffs' contention that the first amendment is ambiguous about whether the Fidelity transaction memorialized a secured loan.

Additionally, it is undisputed that because John failed to pay the agreed sum to Barrick by the agreed date, plaintiffs failed to perform under the first amendment.. Thus, the trial court properly determined that there is no genuine issue of material fact that plaintiffs were the first to materially breach the parties' agreement and cannot maintain an action against defendants for subsequently breaching it. Plaintiffs cannot fail to pay for a multimillion dollar parcel of real

-8-

estate, then complain that the seller failed to convey the property as agreed. See *Michaels v Amway Corp*, 206 Mich App 644, 650; 522 NW2d 703 (1994). Accordingly, we hold that summary disposition of plaintiffs' breach of contract claim was appropriately granted.

## 2. EQUITABLE CLAIMS

Plaintiffs also sought the aid of equity in the trial court, asserting equitable claims including that of unjust enrichment, see *AFT Mich v Michigan*, 303 Mich App 651, 677; 846 NW2d 583 (2014), accounting, see *Bondy v Davis*, 40 Mich App 153, 159; 198 NW2d 418 (1972), breach of fiduciary duty, see *Rapistan Corp v Michaels*, 203 Mich App 301, 313-314; 511 NW2d 918 (1994), constructive trust, see *McPeak v McPeak*, 457 Mich 311, 314-315; 577 NW2d 670 (1998), and equitable mortgage, see *Burkhardt v Bailey*, 260 Mich App 636, 659; 680 NW2d 453 (2004).

The trial court did not address defendants' unclean hands defense. However, as an alternative ground for affirmance,[4] we rule that plaintiffs' equitable claims are barred by the doctrine of unclean hands.

"The clean hands maxim is an integral part of any action in equity." *Stachnik v Winkel*, 394 Mich 375, 382; 230 NW2d 529 (1975). The doctrine of unclean hands "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Id.* (quotation marks and citations omitted). "The very foundation of a court of equity is good conscience, and it will not lend its aid . . . to assist law violators." *Society of Good Neighbors v Van Antwerp*, 324 Mich 22, 28; 36 NW2d 308 (1949). Further, "a tortious act can never be the foundation of an equitable right." *Putnam v Fitzgerald*, 44 Mich 113, 116; 6 NW 198 (1880). "Since the clean hands maxim is designed to preserve the integrity of the judiciary, courts may apply it on their own motion even though it has not been raised by the parties or the courts below." *Stachnik*, 394 Mich at 382.

Although it is true that "[a] defendant with unclean hands may not defend on the ground that the plaintiff has unclean hands as well," *Attorney General v PowerPick Club*, 287 Mich App 13, 53; 783 NW2d 515 (2010), that rule does not mean that a court *will* afford equitable relief to the plaintiff in such situations. Instead, under the doctrine of *in pari delicto*, when the parties are equally in the wrong, "the law will not lend itself to afford relief to one as against the other, but will leave them as it finds them." *Orzel v Scott Drug Co*, 449 Mich 550, 557; 537 NW2d 208 (1995) (quotation marks and citation omitted). See also *Pantely v Garris, Garris & Garris, PC*, 180 Mich App 768, 774; 447 NW2d 864 (1989) ("*In pari delicto*, as a common law doctrine, expresses the principle that wrongdoers ought each to bear the untoward consequences of their

---

[4] See *Demski v Petlick*, 309 Mich App 404, 441; 873 NW2d 596 (2015) ("[T]his Court will affirm when the trial court reaches the right result for the wrong reason."); *Hanton v Hantz Fin Servs, Inc*, 306 Mich App 654, 669; 858 NW2d 481 (2014) ("An appellee may argue alternative grounds for affirmance without filing a cross-appeal if the appellee does not seek a more favorable decision.").

wrongdoing without legal recompense or recourse. . . . [C]ourts should not lend their aid to one who founds a cause of action on an immoral or illegal act. . . . Suit is barred not because the defendant is right, but rather because the plaintiff, being equally wrong, has forfeited any claim to the aid of the court.").

At a minimum, the "parking" arrangement between the parties may be construed as an immoral attempt to defraud John's creditors by sheltering assets from collection. See *Quirk v Thomas*, 6 Mich 76, 101 (1858) (opinion of MANNING, J.) ("A sale or assignment for the purpose of delaying, hindering, or defrauding a creditor in the collection of his debt, was illegal at the common law, and is, in itself, immoral, and against public policy. And the statutes declaring such transactions void as against creditors, are only in affirmance of the common law on that subject.") (quotation marks and citation omitted). Such conduct was also actionable under the Uniform Fraudulent Transfer Act (UFTA), MCL 566.31 *et seq.*, most notably pursuant to MCL 566.34. Hence, plaintiffs' hands are unclean, and they are unentitled to equitable relief. Moreover, even assuming that the parties' hands are equally dirty, under the doctrine of *in pari delicto* the parties should be left in the very situation that they have fashioned. When he sought to defraud his creditors by hiding assets, John assumed the risk that his immoral conduct might be greeted in like kind. There is, as the old aphorism puts it, no honor among thieves.

Because plaintiffs' hands are unclean, they cannot seek the aid of equity. Thus, the trial court could not have committed error warranting reversal by summarily disposing of plaintiffs' unjust enrichment,[5] accounting, breach of fiduciary duty, constructive trust, and equitable mortgage claims.

## 3. MISREPRESENTATION

To establish a prima facie claim of either fraudulent or innocent misrepresentation, a plaintiff must prove, among other things, that the defendant made a material misrepresentation. *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 280 Mich App 16, 38-39; 761 NW2d 151 (2008). Here, with regard to both fraudulent and innocent misrepresentation, the misrepresentation alleged by plaintiffs is that Barrick represented that, after he received the Fidelity property from plaintiffs, he would permit plaintiffs to reacquire it for fair value. Viewing the record evidence in the light most favorable to plaintiffs as the nonmoving party, there is no genuine issue of material fact that Barrick *did* subsequently agree to permit plaintiffs to reacquire the Fidelity property for a mutually agreed sum. Indeed, John's own affidavit acknowledges that, in 2012, he and Barrick "agreed that [John] could redeem the Fidelity Property and fully repay Barrick for all outstanding loan obligations . . . by paying $2.95 million," further agreeing "that the amount of credit given for rents paid on the Fidelity Property would be addressed later." There is, as such, no triable question whether Barrick's representation was false, and the trial court did not err by granting defendants summary disposition of plaintiffs' misrepresentation claims.

---

[5] Under well-settled law, the existence of express contracts between the parties covering the same subject matter was also fatal to plaintiffs' unjust enrichment claim. See, e.g., *Bellevue Ventures, Inc v Morang-Kelly Inv, Inc*, 302 Mich App 59, 64; 836 NW2d 898 (2013).

## 4. CONVERSION

It is undisputed that actual legal title to the Fidelity property passed to defendants before they began to retain the rent proceeds from the Fidelity property. Nevertheless, plaintiffs contend that defendants converted the rent proceeds by retaining them without crediting the rent received against plaintiffs' "loan obligations." Assuming that such loan obligations existed and were enforceable, as plaintiffs claim, plaintiffs' common-law conversion claim still necessarily fails. In the creditor-debtor context, "[t]o support an action for conversion of money, the defendant must have obtained the money *without the owner's consent to the creation of a debtor-creditor relationship* and must have had an *obligation* to return *the specific money entrusted to his care.*" *Lawsuit Fin, LLC v Curry*, 261 Mich App 579, 591; 683 NW2d 233 (2004) (quotation marks and citation omitted; emphasis added). Here, plaintiffs allege that they *did* consent to the creation of a debtor-creditor relationship, whereby defendants *would* retain the rental proceeds from the Fidelity property (i.e., the specific money entrusted to their care), crediting such amounts against existing loan obligations. In consequence, plaintiffs are, as a matter of law, unentitled to maintain a common-law conversion action against defendants.

Likewise, although statutory conversion is a distinct claim, *Aroma Wines & Equip, Inc v Columbian Distrib Servs, Inc*, 497 Mich 337, 361; 871 NW2d 136 (2015), in this case the same outcome is appropriate for both conversion claims. Because defendants did not "convert" the rent proceeds under the common-law principles that govern conversion, defendants are not liable for statutory conversion either. Because the term "converting" in MCL 600.2919a is one with a particular meaning under the common law, we construe it as such. See MCL 8.3a ("[T]echnical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning."). Under the applicable legal meaning, defendants' retention of the rent proceeds did not constitute a "converting" of plaintiffs' assets to defendants' own use. Thus, the trial court did not err by summarily disposing of plaintiffs' statutory conversion claim.

## 5. NEGLIGENCE

Finally, we conclude that the trial court did not err by granting defendants summary disposition of plaintiffs' negligence claim. Plaintiffs have failed to identify a legally cognizable duty owed them by defendants, which is an essential element of any negligence claim. See *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011). "[T]he question of whether the common law, as a matter of public policy, ought to impose" a legal duty is one of law and is decided by courts, not juries. *Chelik v Capitol Transp, LLC*, 313 Mich App 83, 89; 880 NW2d 350 (2015). Ordinarily, courts consider a number of factors in deciding whether to impose a legal duty, including "the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented." *Hill v Sears, Roebuck & Co*, 492 Mich 651, 661; 822 NW2d 190 (2012) (quotation marks and citation omitted).

But here, plaintiffs offered the trial court no argument that such factors militated in favor of imposing a legal duty on defendants. Instead, plaintiffs argued, and continue to argue in this Court, that their negligence claim can be maintained on the basis of a fiduciary duty that Barrick allegedly owed plaintiffs. As we have already explained, however, that equitable theory is

barred by the doctrine of unclean hands. Consequently, even if a negligence claim can be pursued based on the existence of a fiduciary duty—plaintiffs have cited no authority indicating that such a theory is viable—plaintiffs cannot proceed under that theory in this case. Further, plaintiffs could not expect the trial court to fashion some alternative duty argument on their behalf, nor will we do so. The Courts of this state do not serve as research assistants for the parties before them. See *Walters v Nadell*, 481 Mich 377, 388; 751 NW2d 431 (2008) ("Trial courts are not the research assistants of the litigants; the parties have a duty to fully present their legal arguments to the court for its resolution of their dispute."); *Mitcham v City of Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959) ("It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position.") (citations omitted).

In any event, we fail to see how any legal duty plaintiffs might identify could viably support their negligence claim under the circumstances at bar. Generally, "a tort action will not lie when based solely on the nonperformance of a contractual duty." *Fultz v Union-Commerce Assoc*, 470 Mich 460, 466; 683 NW2d 587 (2004). The threshold inquiry "is whether the defendant owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations. If no independent duty exists, no tort action based on a contract will lie." *Id*. (emphasis added). Upon plenary review of the pleadings and the record, we discern no duty—aside from contractual duties—that defendants owed plaintiffs. Because plaintiffs have identified no legal duty to support their negligence claim, the trial court did not err by summarily disposing of it.

## B. DOCKET NO. 328983

Having concluded that the trial court properly granted defendants summary disposition of all claims in this action, we turn to Timothy's claim of appeal. Before reaching the substantive merits, this Court will "[a]s a rule, . . . decline to consider" issues "that it does not have the power to determine, including those that are moot." *In re MCI Telecommunications Complaint*, 460 Mich 396, 436 n 13; 596 NW2d 164 (1999). An issue is moot if "it presents nothing but abstract questions of law, which do not rest upon existing facts or rights," *Anglers of AuSable, Inc v Dep't of Environmental Quality*, 489 Mich 884 (2011) (quotation marks and citation omitted), or "when a subsequent event renders it impossible for the appellate court to fashion a remedy," *Garrett v Washington*, 314 Mich App 436, 450; 886 NW2d 762 (2016) (quotation marks and citation omitted). Here, the record indicates that Timothy was never actually deposed pursuant to the order he seeks to appeal, nor, given our ruling in Docket No. 331987, will he be deposed. Consequently, Timothy's claim of appeal is moot.

## IV. CONCLUSION

In Docket No. 328983, we dismiss, as moot, Timothy's claim of appeal. Because we issue no substantive ruling in Docket No. 328983, no party may tax costs in that matter pursuant to MCR 7.219.

In Docket No. 331987, we affirm the trial court's contested summary disposition ruling. As the prevailing parties, defendants may tax costs pursuant to MCR 7.219.


/s/ Jane E. Markey
/s/ Kurtis T. Wilder